**Margaret E. KOKE and Anna C. Koke, Appellants,**

v.

**STIFEL, NICOLAUS & CO., INC., and Kingsley O. Wright, Sr., Appellees.**

No. 79-2025.

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1980.

Decided May 14, 1980.

Mark I. Bronson, St. Louis, Mo. (argued), and Samuel J. Goldenhersh, St. Louis, Mo., on brief, for appellants.

Thomas E. Douglass, Coburn, Croft & Putzell, St. Louis, Mo. (argued), and Christopher F. Jones, St. Louis, Mo., on brief, for appellees.

Before HEANEY and ARNOLD, Circuit Judges, and SACHS,* District Judge.

ARNOLD, Circuit Judge.

This is a securities fraud case. Margaret and Anna Koke appeal from a summary judgment dismissing their two-count complaint with prejudice. Count I alleged that Stifel, Nicolaus & Co. and Kingsley O. Wright, Sr., a vice-president of that brokerage firm, violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, Rule 10b–5 promulgated thereunder, and § 17 of the Securities Act of 1933, 15 U.S.C. § 77q.[1] Count II alleged common-law fraud under pendent jurisdiction. In granting summary judgment, the District Court[2] held that both counts were barred by the two-year statute of limitations provided by the Missouri Uniform Securities Act, Mo.Rev.Stat. § 409.411(e) (1969). The District Court had before it a substantial amount of discovery, including two depositions of Margaret Koke, her affidavit, and several exhibits. We affirm the dismissal of Count I; as to Count II, we vacate the ruling below and remand with instructions to dismiss the complaint without prejudice.

## I. FACTS

We first summarize the facts before the Court below. Margaret Koke works for a small St. Louis business known as Southside Service Company, a home appliance repair service. She started as a call clerk, became a bookkeeper in 1941, and later assumed the role of manager in addition to the bookkeeping duties. In these capacities, she pays the bills, figures the payroll, sees to it that servicemen do their jobs, and makes sure that parts are properly ordered.

Southside Service Company was owned by Joseph E. Loisseau until 1969. Margaret invested in Associated Fund in 1954 or 1955 through a friend of Loisseau's. She also purchased government savings bonds from time to time. She was not an experienced investor, although she had accumulated, mostly through thrift, a rather sizeable estate. Margaret and her mother, Anna Koke, lived together in St. Louis. Anna had no experience handling money, having relied entirely upon her husband to manage the family finances. When he died in 1955, Margaret took over the management of the household and assumed the responsibility for taking care of her mother. In 1972, Anna went to a nursing home to live and is still there.

---

* The Hon. HOWARD F. SACHS, United States District Judge for the Western District of Missouri, sitting by designation.

1. The appellants have not pressed in this Court their claim under § 17 of the Securities Act of 1933, and we are treating this claim as abandoned.

2. The Hon. James H. Meredith, Senior United States District Judge for the Eastern District of Missouri. The opinion below is reported at 480 F.Supp. 747 (E.D.Mo.1979).

Margaret Koke became acquainted with Kingsley O. Wright in the late 1960s when he was with the brokerage firm of A.G. Edwards & Sons. Margaret bought mutual funds which Wright recommended, investing $25,000 of her own money and $15,000 of her mother's. Wright told her that she was making a sound investment, but Margaret did not know the type of securities she was investing in and didn't ask anyone. There is no claim in this suit that the Kokes were dissatisfied with the way their A.G. Edwards account was managed by Wright. Wright handled her account at A.G. Edwards until he left there in 1969 and took a similar position with Stifel, Nicolaus & Co.; Margaret transferred her account and her mother's to Stifel at that time, too, and Wright continued to manage them.

The events which led to the filing of this suit occurred after Wright left A.G. Edwards for Stifel and took the Koke accounts with him. They are recounted here from plaintiffs' point of view, giving them the benefit of all reasonable inferences, as we must when reviewing a summary judgment. One day Wright called Margaret. He told her about a new bond program that he and Stifel were starting for retirees. Wright explained that the investment would be stable, that "he· and Stifel Nicolaus and we would all be in [it] together," that it would provide a steady income, and that he wanted "to get us out of mutual funds because he wasn't too sure what was happening there . . . ." Wright further allegedly represented that the program involved no risk—"if anything happened to [the bonds] why the whole country—nothing would be of any value. . . . [M]y E bonds, my war bonds would not be any good, my money in the bank wouldn't be any good and nothing would be any good." Wright represented, and Margaret believed, that purchasing the bonds Wright suggested would provide a steady income at no risk. She replied: "Well, King, you know best, I'm leaving it up to you. I don't have the time to check into anything, it's up to your judgment."

Wright began purchasing bonds for the Kokes' accounts in November, 1971, and continued to do so until May, 1973. At his suggestion, Margaret's and Anna's accounts were merged in 1972. The bonds purchased were not the "no risk" investment they were supposedly represented to be, and on at least five separate occasions—July, August, and October of 1972, and May and August of 1973—the Kokes through Wright sold bonds at losses. All of the purchases and sales were immediately reported to the Kokes by way of confirmation slips and monthly by account statements, but because these writings appeared to Margaret to have been written in "hieroglyphics," she did not understand them and did not pay much attention to them. Upon their receipt, she simply put them in a drawer. She never knew that she was losing money and that the value of the account was decreasing. On occasion, Wright would send requests for more money, and she would ask him why it was necessary; Wright would assure her that "nothing had happened to my account. I needed to increase my capital to keep interest at the same level." Wright constantly reassured her that nothing was wrong, and because she trusted him didn't ask questions about the details. Throughout all of her transactions with Wright and Stifel, Nicolaus, Margaret acted as her mother's agent; Anna knew nothing about the bond program and wasn't interested in it. She trusted Margaret to manage her money for her. Margaret, in turn, trusted Wright, and she told him on several occasions that she was trusting him to watch her interests.

On September 17, 1974, all of the remaining bonds in the Koke account were sold at a loss, and no further purchases or sales were made on their account. At least eight confirmation slips showing the sales at a loss were received by Margaret on September 20, 1974, and on September 27, 1974, she received a monthly account statement summarizing the sales and losses. As was true with all written confirmations and monthly account statements, Margaret did not understand them and put them in a drawer.

On March 7, 1975, Anna Koke's federal tax return was prepared, and the losses

from the bond sales were indicated. The return was prepared by an accountant, to whom Margaret had provided the confirmation slips and monthly account statements. Margaret did not read the return but merely glanced over it without realizing that it reflected the losses in question.

On March 6, 1975, the Kokes' bond account with Stifel, Nicolaus was closed, but Margaret did not know of the closing until much later. In late November or early December, 1976, Margaret read a newspaper article about the trial of the suit by Milton Garnatz against Stifel, Nicolaus & Co., and Wright. See *Garnatz v. Stifel, Nicolaus & Co.*, 559 F.2d 1357 (8th Cir. 1977). She got in touch with the attorney representing Garnatz, and as a result she for the first time learned facts which led her to conclude that she had been defrauded through Wright's misrepresentations.

Suit was filed on March 30, 1977. The complaint alleged that the defendants, Kingsley O. Wright, Sr., and Stifel, Nicolaus & Co. fraudulently represented that bonds were a stable, steady investment which would provide a steady income without fluctuation; that the bonds purchased for the plaintiffs would be of high quality and that there was no way they could lose; and that the recommended bonds and security purchases were part of a new plan for retirees, in which Stifel, Nicolaus was itself participating. The plaintiffs claimed that all of these representations were in fact false, and known by the defendants to be false. There was a substantial amount of discovery. Both Margaret Koke and Kingsley Wright were deposed twice, and the parties answered interrogatories and requests for production. The defendants moved for summary judgment on September 6, 1979. The plaintiffs filed a timely opposition to the motion. Judgment was entered for the defendants on November 20, 1979, and this appeal followed.

## II. COUNT I

We first consider whether the granting of summary judgment on Count I was appropriate. In *Morris v. Stifel, Nicolaus & Co.*,

600 F.2d 139 (8th Cir. 1979), we held that suits brought in Missouri under § 10(b) of the Securities Exchange Act of 1934 must be filed within the two-year period of limitations provided by Mo.Rev.Stat. § 409.-411(e) (1969), and we adhered to our previous ruling that the limitations period runs "from the date of discovery of the fraud or from the date the fraud upon reasonable inquiry should have been discovered." *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). Here, suit was filed March 30, 1977. If, upon reasonable inquiry, Margaret Koke should have discovered the alleged fraud more than two years earlier, before March 30, 1975, then Count I of the complaint was properly dismissed. We approach the question, of course, mindful that summary judgment is a drastic remedy and should be granted only in clear cases.

The standard is an objective one. *Hupp v. Gray*, 500 F.2d 993, 997 (7th Cir. 1974). What facts would alert a reasonable person to the possibility of wrongdoing? *Long v. Abbott Mortgage Corp.*, 459 F.Supp. 108, 116 (D.Conn.1978). Investors are not free to ignore warning signals which would cause a reasonable person to ask questions, but must "exercise reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Hupp v. Gray, supra*, 500 F.2d at 996. "[T]he statutory period . . . [does] not await appellant's leisurely discovery of the full details of the alleged scheme." *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970). It comes down to this: Should a reasonable person in the position of Margaret Koke, upon reasonable inquiry, have discovered the facts constituting the alleged fraud on or before March 30, 1975?

The answer is yes. The confirmation slips and monthly account statements which were sent to Margaret were sufficient to require the initiation of an inquiry. While they are not a model of clarity for the novice investor, they provide information sufficient to require a reasonable per-

son to ask questions.[3] Even if Margaret Koke did not understand them, she was not free to ignore them, and that is what she did; she did not examine them carefully and did not ask anyone to explain them. The following exchange, which occurred during her first deposition, describes the actions she took to understand her account:

Q Let me also ask you, did you receive monthly account statements every month from Stifel Nicolaus after Mr. Wright moved to Stifel Nicolaus? Did you receive these every month?

A I suppose it was every month. I used to get them—it was every month I used to get them.

Q You said you didn't understand them, is that correct?

A That's right.

Q When you first received one, did you testify that you did not understand them?

A I never could figure out what the heck they were doing, no, I never could.

Q What attempts did you make to figure out the monthly account statement?

A I guess, basically, I never did go any further than just looking at them and not understanding them. I never went any further than that.

Q Did you ever ask Mr. Wright about them?

A No.

Q And what they meant?

A No.

Q Did you ever ask anybody at Stifel Nicolaus how you had done on your investments for the year [in preparation for the filing of tax returns]?

A No.

Q Did you have any interest in how your investments were doing from time to time?

A I never really—I just left everything up to him, sir. I never went into any of it, never did.

Q Not even to know whether your bonds had risen or fallen in value?

A No, honestly.

Miss Koke simply did not exercise the care and diligence reasonable under the circumstances to understand what was happening to her account. Had she examined the confirmation slips and compared them with each other, she would have discovered that bonds were being sold at substantial losses. For example, the sale of a particular bond at a certain price was indicated by a confirmation slip. The purchase of the same bond at a higher price would have been disclosed by an earlier confirmation slip. A comparison of the two slips, and simple arithmetic, would have indicated a loss. The same kind of simple comparison and examination of the monthly account statements would have revealed the same information.

The confirmation slips and account statements reflecting losses were received by Margaret during 1972, 1973, and 1974. Although we need not fix a precise date, it is clear that at some point a reasonable person would have, upon reasonable inquiry, discovered that Wright's representations were untrue. The District Court fixed that date at no later than March 6, 1975, the date the Kokes' bond account was closed. We believe that this date gives the Kokes the benefit of every reasonable doubt.

Miss Koke's tax returns were prepared yearly by an accountant, yet she did not ask him for assistance in understanding her bond account. Again, we turn to her deposition:

Q I'll give you back Defendants' Exhibit H, your 1972 tax return that shows

---

**3.** Each slip confirmed the purchase or sale of bonds and provided the following information: the name of the bond, the number of bonds bought or sold, the price per bond, the date of the purchase or sale, the gross amount of the transaction in dollars and cents, and the commission. Each slip stated at the bottom in small print: "Please advise us immediately if this confirmation is not in complete accordance with your understanding." The monthly account statements consisted of a series of six columns which provided information about bond transactions occurring during a given month. The columns were labeled as follows: Date, Bought Received Or Long, Sold Delivered Or Short, Description, Price, Debit, Credit.

under capital gains and losses, a loss of fifty thousand Glen Aldens. Did you ever read your tax return in 1972 showing that loss?

A   I don't remember.

Q   Glen Aldens were some of the bonds you had purchased from Mr. Wright, is that correct?

A   I don't even—I couldn't even tell you what the names—I mean, if you'd ask me, I couldn't even tell you for sure.

Q   Let me give you back Defendants' Exhibit A, your first bond statement. Does it show Glen Alden as being one of the bonds you purchased?

A   Yes it does.

Q   Did you ever read that?

A   I never actually tried to figure those out, sir, I never did.

Q   Did you ever read that to determine the names of the bonds that had been purchased for you?

A   No I didn't, sir.

Q   Did you ever ask Mr. Wright what bonds had been purchased for you?

A   No.

Q   Mr. Keller prepared your tax returns, is that correct?

A   Yeah.

Q   Did he ever discuss the returns with you?

A   No he didn't.

Q   Did he read through them with you?

A   No he didn't.

Q   What type of information did you give Mr. Keller concerning your bonds to permit him to prepare your tax return?

A   Well, I would just send him the little forms that I would get from the savings and loans and the forms that I would get from either A. G. Edwards or Stifel Nicolaus and just put'em in an envelope and send them all in to him.

Q   Did you ever ask him how you had done during the year on your investments?

A   No, never talked to him.

The District Court was correct in concluding that Court I was barred by the statute of limitations, and the dismissal of that Count is affirmed.

## III.   COUNT II

Count II of the complaint incorporated the allegations of Count I and alleged fraud under the common law of Missouri. The District Court held that the fraud claim was barred by the same statute of limitations that barred Count I, Mo.Rev.Stat. § 409.-411(e) (1969), reasoning that this statute "was made applicable to plaintiffs' state claim by the decision   .   .   .   in *Morris v. Stifel, Nicolaus & Co., supra*." The appellants argue that an action in Missouri for common-law fraud is governed by the five-year period of limitations set out in Mo.Rev. Stat. § 516.120 (1969).

At the outset, we cannot agree that *Morris* is controlling. We stated in *Morris* that:

> [t]he only issue presented on appeal is whether the district court properly applied the two-year blue sky limitations period contained in section 409.411 to appellants' federal securities claims, or whether the court should have instead applied the five-year period provided in section 516.120 for common law fraud.

*Morris v. Stifel, Nicolaus & Co., supra*, 600 F.2d at 140. *Morris* dealt with the proper period of limitations for Rule 10b–5 actions, and the resolution of the limitations question in that case does not apply to fraud claims under Missouri law.

We find it unnecessary, however, to resolve the limitations issue, and we express no opinion about whether § 516.120 should have been applied rather than § 409.411(e). We find, instead, in light of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and its successors, that the pendent fraud claim should be dismissed without prejudice.

■   In *Gibbs*, the Court set out the basic principles which should be applied where federal and state claims are presented together. First, the federal claim must be

substantial enough for the vesting of subject-matter jurisdiction. Second, the federal and state claims must present one constitutional "case." If they derive from a common nucleus of operative fact, and if aside from their federal or state character, they normally would be tried in one proceeding, this element is present. Third, even if the court has the power in a constitutional sense to hear the entire case, it need not do so, for "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." 383 U.S. at 726, 86 S.Ct. at 1139. The exercise of the court's discretion involves "considerations of judicial economy, convenience and fairness to litigants" and "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties." *Ibid.*

[4] In the case at bar, it is clear that the federal securities claim was substantial. Claims are "insubstantial only if the prior decisions inescapably render the claims frivolous . . ." *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 859, 35 L.Ed.2d 36 (1973). The federal and state claims here presented would *normally* be tried together, since their factual bases are identical. And, had the motion for summary judgment been denied, weighing judicial economy, convenience, and fairness to the parties, the District Court would have been warranted in exercising its discretion in favor of trying both claims in the same lawsuit.

■ This case, however, did not proceed in such a fashion. The federal claim was dismissed before trial, and we have upheld that dismissal. The Supreme Court in *Gibbs* said that if the federal claims are dismissed before trial, "the state claims should be dismissed as well." *United Mine Workers v. Gibbs, supra*, 383 U.S. at 726, 86 S.Ct. at 1139. Although this statement appears unconditional, later cases leave substantial doubt that it was intended to be mandatory. In *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), in a three-judge-court context, the Court ruled

that the mootness of the federal constitutional question did not deprive the court of power to hear pendent nonconstitutional claims. We agree with the Tenth Circuit that, as long as the federal claim is not dismissed for insubstantiality, "the *Gibbs* dictum is not a restriction on a court's power but rather is a guide to the exercise of its discretion." *Transok Pipeline Co. v. Darks*, 565 F.2d 1150, 1155 (10th Cir.), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978). *Accord, State of Arizona v. Cook Paint & Varnish Co.*, 541 F.2d 226, 227 (9th Cir.), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977); *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974) (if federal claims are subject to dismissal or summary judgment, pendent jurisdiction should not be exercised "absent exceptional circumstances.") In *Kuhn v. National Ass'n of Letter Carriers*, 528 F.2d 767, 771 n. 6 (8th Cir. 1976), we said that the "early dismissal of the federal claim is one factor tending to support dismissal of the state claim as well, . . . but it is not determinative." Thus, we conclude that the dismissal of the federal securities claim before trial, standing alone, did not *compel* dismissal of the state fraud claim.

This conclusion does not end the inquiry, however. The question still remains whether, in the circumstances of this case, the state claim *ought* to be tried in federal court. In *Kuhn*, we suggested that appropriate factors for consideration are the difficulty of the state claim, the amount of judicial time and energy already invested in it, the amount of additional time and energy necessary for its resolution, and the availability of a state forum. *Ibid.* Having weighed these considerations, we are convinced that the state claim should be dismissed without prejudice. We are influenced primarily by the desire to avoid the needless, and non-definitive, federal resolution of an important question of state law. The limitations question has not been resolved by the Missouri appellate courts. The only Missouri case squarely in point is the decision of Judge Hoester of the Circuit

Court of St. Louis County in *Braun v. Stifel, Nicolaus & Co.*, No. 390344 (1979), *appeal pending*, Missouri Court of Appeals, Eastern District, No. 42498. Judge Hoester held that a common-law securities fraud claim is governed by the two-year limitations period set out in Mo.Rev.Stat. § 409.-411(e) (1969). Since an appeal is pending in *Braun*, a more definitive ruling on the limitations question should be forthcoming. We are persuaded that dismissal of the state claim at bar is warranted as a matter of comity.

We are also influenced by the availability of a state forum in which the Kokes may litigate their claim. At argument, counsel for appellants disclosed that they some time ago filed in state court a suit against the appellees virtually identical to Count II. Thus, our dismissal will not foreclose the opportunity for litigation in state court.

We do not foresee a significant increase in inconvenience to the parties if the fraud claim is pursued in state court rather than federal. The discovery in the District Court can be used in the state litigation, so the efforts of the parties to gather facts will not have been wasted. And finally, dismissal will allow the appellants to obtain a definitive ruling on the limitations issue in state court, thereby "procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, *supra*, 383 U.S. at 726, 86 S.Ct. at 1139.

We vacate the ruling of the court below on Count II, and remand with instructions to dismiss that Count without prejudice.