**Lewis NERMAN, et al., Plaintiffs,**

v.

**ALEXANDER GRANT & COMPANY, et al., Defendants.**

**No. 84–1008–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

Sept. 24, 1987.

Thomas C. Brown, Michael R. Thiessen, David R. Nachman, Brown & Thiessen, P.C., Kansas City, Mo., John R. McFarland, James R. Keller, Coburn, Croft & Putzell, St. Louis, Mo., for plaintiffs.

Gene E. Voigts, Peter E. Strand, Shook, Hardy & Bacon, Kansas City, Mo., Alan S. Rutkoff, McDermott, Will & Emery, Chicago, Ill., for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BARTLETT, District Judge.

On September 24, 1984, plaintiffs filed this lawsuit against Alexander Grant & Company (Grant), a national partnership of certified public accountants, and ten of its partners alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the Securities Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.-10b–5. Plaintiffs also assert several state law violations. After plaintiffs filed a second amended complaint, defendants moved for summary judgment.

Plaintiffs allege in their amended complaint that Grant had provided tax, accounting and financial advice to all plaintiffs except Barney Karbank prior to 1976. In late 1976, Grant allegedly solicited plaintiffs to invest in Jefferson Phase II Investment Associates (Jefferson) and Polls Creek Associates of Illinois (Polls Creek). Jefferson, a Missouri limited partnership organized by Grant, was to be a limited partner in Polls Creek, a limited partnership with interests in mineral and coal leases for mining operations in Kentucky. Plaintiffs contend that Grant provided assurances that investment in Jefferson and Polls Creek would entitle them to claim significant deductions on their individual federal income tax returns. Plaintiffs allegedly relied on Grant's advice and purchased partnership interests in December 1976. Plaintiffs claimed deductions on their 1976 federal income tax returns. In 1983 and 1984, the Internal Revenue Service (IRS) issued notices of deficiency disallowing the deductions.

### Standard for Summary Judgment

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment

shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the Court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States*, 600 F.2d 725, 727–28 (8th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 2553.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the *absence* of genuine issues of material fact. However, the moving party *is not required* to support its motion with affidavits or other similar materials *negating* the opponent's claim. *Id.* (emphasis added).

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for

trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in his pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* 106 S.Ct. at 2511. The inquiry to be made mirrors the standard for a directed verdict: whether the evidence presented by the party with the onus of proof is sufficient that a jury could properly proceed to return a verdict for that party. *Id.* Essentially, the question in ruling on a motion for summary judgment and on a motion for directed verdict is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 2512.

### Count I: RICO

Plaintiffs claim in Count I that Grant's fraudulent and criminal activities involving the solicitation and sale of interests in Polls Creek and Jefferson violate civil RICO, 18 U.S.C. § 1962, *et seq.* Defendants assert in their motion for summary judgment that plaintiffs have not satisfied RICO's "pattern of racketeering" requirement because plaintiffs have presented evidence of only one fraudulent scheme.

In *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Court stated that the elements of a violation of RICO are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." To establish a "pattern of racketeering activity," a plaintiff must show "continuity plus relationship." *Id.* 105 S.Ct. at 3285 n. 14. Proof of a "pattern of racketeering requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus rela-*

*tionship* which combines to produce a pattern." *Id.* (emphasis in original).

In *Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257 (8th Cir.1986), the Court concluded that although the plaintiff had proven the existence of a "relationship," it had failed to prove the "continuity" sufficient to form a "pattern of racketeering activity." The Court found "no proof that [defendants] had ever done these activities in the past ... [or] were engaged in other criminal activities elsewhere." *Id.* "[O]ne isolated fraudulent scheme" even if implemented by several fraudulent acts, does not constitute a "pattern of racketeering activity." *Id.*

Here, plaintiffs advance two arguments to support their claim that Grant engaged in a "pattern of racketeering activity." First, plaintiffs contend that after Grant induced them by misrepresentations to purchase interests in Jefferson and Polls Creek, Grant failed to disclose critical information it had obtained about the investments. For instance, plaintiffs allege that Grant failed to inform them at the end of 1977 that the IRS adopted new regulations that would result in disallowance of plaintiffs' deductions; that Grant had not provided plaintiffs with the Investment Memorandum before plaintiffs purchased interests in Jefferson and Polls Creek; that Grant had developed serious reservations about the Kentucky coal mining operations that were essential to the success of the investments; that Grant had distanced itself from Howard Flomenhoft, the promoter of Polls Creek; and that Grant had misled Jerold Bressel, Jefferson's attorney, in his investigation of the partnerships.

Even if all of these alleged acts had been properly established under Rule 56, or were to be proved at trial, they are at most additional fraudulent acts implementing a single fraudulent scheme, i.e., fraudulently inducing investment in Jefferson and Polls Creek. *See Superior Oil,* 785 F.2d at 257. Therefore, plaintiffs have not properly presented facts that would support the conclusion that Grant engaged in a "pattern of racketeering activity." *See Komm v. McFliker,* 662 F.Supp. 924, 927 (W.D.Mo. 1987) ("Allegations of multiple predicate acts are ... insufficient to state a civil RICO claim if they are merely subdivisions of a single scheme.").

Plaintiffs' second argument is based on their assertion that Grant was involved with limited partnerships other than Jefferson that invested in Polls Creek. Many of the facts plaintiffs rely on for this argument are not properly presented under Rule 56. *See* Plaintiffs' Response to Defendants' Motion for Summary Judgment With Respect to Second Amended Complaint, pp. 64–72. Without a proper factual basis, plaintiffs' second argument must be rejected. However, even if the factual allegations had been properly established under Rule 56, plaintiffs have not demonstrated that Grant engaged in other fraudulent activity that is unrelated and "sufficiently unconnected in time and substance" from the scheme asserted in this case, or that Grant engaged in "separate criminal activities elsewhere." *See Superior Oil,* 785 F.2d at 257; *Wodlinger v. Bold,* [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,956 at 94,674–75 (W.D.Mo. October 6, 1986). [Available on WESTLAW, DCT database].

Alternatively, plaintiffs urge me to ignore *Superior Oil's* interpretation of RICO's "pattern of racketeering activity" and adopt the more liberal interpretation in *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir.1985) and *Bank of America National Trust and Savings Ass'n v. Touche, Ross and Co.,* 782 F.2d 966 (11th Cir.1986).

Not only is *Superior Oil's* interpretation supported by *Sedima,* but the Eighth Circuit Court of Appeals recently reaffirmed its interpretation of the "pattern" requirement. *See Madden v. Gluck,* 815 F.2d 1163, 1164 and n. 1 (8th Cir.1987), *petition for cert. filed,* June 30, 1987. Plaintiffs' argument that I interpret the "pattern" requirement differently should be addressed to either the Court of Appeals or the Supreme Court, not to me.

Therefore, because plaintiffs have failed to show that there is a genuine issue for trial on an essential element of their RICO claim, defendants are entitled to prevail as

a matter of law on Count I of the second amended complaint. Accordingly, defendants' motion for summary judgment on Count I will be granted.

### Count II: Federal Securities Claims Under § 10(b) and Rule 10b–5

Plaintiffs allege in Count II of the second amended complaint that Grant violated federal securities laws by misrepresenting facts to induce them to invest in Jefferson and Polls Creek. Defendants move for summary judgment arguing that these claims are barred by the statute of limitations.

As plaintiffs acknowledge, the statute of limitations is two years for claims brought in this court for violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. *Morris v. Stifel, Nicolaus & Co., Inc.*, 600 F.2d 139 (8th Cir.1979). If plaintiffs discovered the fraud, the limitations period begins to run from the date of discovery. *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). Alternatively, even if plaintiffs have not discovered the fraud, the limitations period begins to run from "the date the fraud upon reasonable inquiry should have been discovered." *Id.* Whether plaintiffs "should have" discovered the fraud is measured by an objective standard. *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1343 (8th Cir.1980) "What facts would alert a reasonable person to the possibility of wrongdoing?" *Id.* "Investors are not free to ignore warning signals which would cause a reasonable person to ask questions, but must 'exercise reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" *Id., quoting Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir.1974). *See also Buder v. Merrill Lynch, Pierce, Fenner & Smith*, 644 F.2d 690, 692–93 (8th Cir.1981).

Plaintiffs filed their complaint on September 24, 1984. Therefore, the initial inquiry must be whether plaintiffs had discovered Grant's alleged fraud by September 24, 1982. If plaintiffs had not discovered Grant's alleged fraud by September 24, 1982, then the inquiry must be whether by September 24, 1982, plaintiffs should have discovered Grant's alleged fraud had reasonable inquiry been made.

### Undisputed Facts as to Claims of all Plaintiffs Except Karbank and the Shaws [1]

In December 1976, plaintiffs invested in Jefferson, a Missouri limited partnership organized and promoted by Grant. Jefferson was a limited partner in Polls Creek Associates of Illinois.

In February 1977, Grant sent the Jefferson partners copies of the "Investment Memorandum for Polls Creek Associates" (Memorandum). Investment in Polls Creek was available to a limited number of persons, partnerships and trusts. Polls Creek was said to be engaged in the production and mining of coal in Kentucky. The risks involved in investing in Polls Creek were described in part as follows:

> Investment in the Partnership involves a high degree of risk and is suitable only for those persons who have, and will continue to have, a high amount of annual income and a substantial net worth and who can afford to bear such risks and have no need for liquidity from such investment.

> •   •   •   •   •

> Although the Logan Report will show the existence of substantial recoverable coal reserves from the Partnership's Coal Property based upon historical geology data, field inspection, spot core drilling and other factors, there can be no assurance that such coal reserves in fact exist, are in such quantities, consistently, or on the average or have the specifications

**1.** All plaintiffs except Barney Karbank and Lee and Cleo Shaw purchased interests in Jefferson. The Shaws, through RC1 and RC2 Mineral Trusts, invested directly in Polls Creek. Karbank invested in Polls Creek of Kansas City, a limited partnership similar to Jefferson.

Because they did not invest in Jefferson, the facts as to the claims asserted by the Shaws and Karbank will be set forth later.

shown in the report or that such reserves are physically or economically recoverable.

.    .    .    .    .

In the event that the price at which the Partnership is able to sell its coal is not in excess of the sum of its mining costs, required payments of principal and interest on its Note to Sublessor and other obligations and other costs, the Partnership may be unable to meet all of its obligations and may determine to stop mining operations. In either event, it runs the risk that, because of its inability to pay its fixed obligations on the Note to Sublessor, it may have to forfeit the Coal Rights. In such event the Limited Partners may lose their entire investment and also realize a substantial tax burden.

.    .    .    .    .

Despite the contract with The Dayton Power and Light Company (running to Acero, Inc., not to the Partnership), there can be no assurance that the Partnership will be able to market its coal at a price which will permit it to recover costs incurred under the Contract Mining Agreement and still earn a profit. In the event that it is unable to cover such costs, the Partnership and the Limited Partners may suffer substantial adverse financial consequences, including the loss of their entire investment.

Other potential risks described in the Memorandum include possible problems with the sale and marketing of the coal, changes in the price of energy, and defects in title to the coal properties.

Additionally, the Memorandum warned investors of "substantial tax risks." For instance:

Every potential investor should assume that the Internal Revenue Service would claim that some if not all of the deductions this Partnership will claim are not allowable; this means *every partner* of of this Partnership should *assume* he will be audited.

In a separate section of the Memorandum titled "Special Tax Factors on Coal Partnerships (Including Tax Reform Act of 1976 Factors)," investors were told that:

The basis on which tax benefits are claimed is on the basis of making an advanced royalty payment. There is a definite tax advantage in that alone, but the key issue here is even more significant, and that is whether or not an advanced royalty payment can be deducted to the extent it is represented by a nonrecourse (nonnegotiable) Note from the Partnership....

The Partnership will claim a deduction for the obligation for the advanced royalties incurred ("accrued") upon acquisition of the sublease, to be paid in cash to the Sublessor, and, since the Partnership will adopt the accrual method of accounting for Federal income tax purposes and the Partnership feels that there is a reasonable certainty the Nonrecourse Note will be paid, the Partnership will claim a deduction for the advanced royalties to be paid by the issuance of the Nonrecourse Note. However, there is a substantial risk that such deductions will be challenged by the Internal Revenue Service. There is a substantial risk that upon challenge, the deductions, particularly with respect to the portion to be paid by issuance by the Nonrecourse Note, could not be sustained by litigation.

In early 1977, the Jefferson partners did not receive the promised cash distributions. Several of them were concerned about this delay. Plaintiffs Jerome Nerman, Lewis Nerman and the Spitcaufskys met to discuss why they had not received the expected payments and whether Grant's representations about the investments were true.

Also in early 1977, plaintiff Lewis Nerman learned from his attorney that the coal being mined did not meet required quality standards and that only a small percentage of it had been accepted by the buyers. Before he invested, Nerman was told by Grant that it had "checked out" the quality of the coal.

On July 22, 1977, the lawyer for Jefferson, Jerold Bressel, advised the Jefferson partners by letter that the partnership had

received the first cash distribution from Polls Creek. Bressel stated in the letter:

As you are well aware, these monies should have been received by this partnership long before this date. In light of this fact, on behalf of this partnership I initiated communication with Mr. Howard C. Flomenhoft, the attorney from Chicago, Illinois, who promoted and syndicated this coal mine investment. Mr. Flomenhoft explains the delays in our receipt of monies on Kentucky weather conditions during the months of January and February which restricted coal production to 4,468 and 4,070 tons for said months respectively. Production for the month of March, 1977, exceeded 7,000 tons. Further, Mr. Flomenhoft has related problems regarding lost documents representing the consummation of Polls Creek Associates' transaction with Aminex Coal Development Corporation. Mr. Flomenhoft indicates that there is "no problem" concerning such documents.

The late receipt of monies on this investment has raised certain questions. It is my belief that we should not permit these questions to go unanswered. Presently, Mr. Flomenhoft states that we should soon be in receipt of additional monies for April, May and June, 1977, coal production, but this means another late payment. I believe that conservative investment management dictates that further steps be taken to protect each partner's interest in this investment.

After listing the steps recommended to protect each partner's investment, Bressel concluded: "It is my intention to fully investigate these matters, implement the proposed protective measures, and review whatever information is available so that you may be fully informed in this investment venture."

On August 3, 1977, Bressel again wrote the Jefferson partners stating that Flomenhoft had requested that each of them authorize Bressel's "continued investigation and inspection of documents regarding this transaction." Bressel asked the Jefferson partners to execute and return forms authorizing his law firm "to undertake and implement procedures to monitor the collection and distribution of funds" to Jefferson. Bressel received executed authorizations from all plaintiffs, except Emmet Davis.

On September 15, 1977, Bressel transmitted a second cash distribution to the Jefferson partners. Bressel stated in an accompanying letter that the investigation of Polls Creek and Aminex was continuing. Also, he told the partners that "until more favorable answers are provided," the investigation "shall continue per my recommendations communicated to you in previous letters." Bressel requested that the Jefferson partners execute and return "Delegation of Authority" forms which gave Bressel and his law firm

authority to represent the collective interests of the partnership and make all decisions for the partnership referring to the affairs and policies of the partnership, without consulting, conferring or meeting with the members of the partnership, and to do and undertake all acts which may lawfully be undertaken by the partners acting in the partnership name.

Bressel received the executed forms from substantially all plaintiffs.

In October 1977, several Jefferson partners met with Flomenhoft to discuss problems with the investments in Jefferson and Polls Creek. Questions raised at the meeting included whether title insurance for the coal should be obtained, whether Polls Creek and Jefferson were properly organized and financed, and how Aminex received payments from the partnerships. According to plaintiff Barney Karbank, these questions generated "some concern" at the meeting whether the promoters "along with Grant's people" had used "due diligence in investigating the investment they were recommending."

On November 2, 1977, Bressel wrote to the Jefferson partners that he had met with Flomenhoft in October and had asked him why the anticipated monthly distributions had not been received.

This is, of course, also directly related to the other issues: a) the legal status of

[Polls Creek]; b) the nature of our claim to any title to coal being mined in Kentucky by Aminex; and c) any steps Mr. Flomenhoft has taken to get information previously requested by our partnership.

.    .    .    .    .

Hopefully, the requested documentation will be provided for my review so that many of the unanswered questions will become answered. We must understand that the benefit of this transaction is in the retention of tax benefits which do not appear to be jeopardized and secondarily as a return of investment.

It is my intention to be persistent on requesting Mr. Flomenhoft's "follow through" in providing the requested information and documents. In the event Mr. Flomenhoft fails to continue cooperating and/or provide the requested information then after consultation with you, direct action against Aminex Coal Development Corporation may be instituted. I shall keep you advised in this matter and further welcome answering any questions you might have.

On December 14, 1977, Bressel reported to the Jefferson partners about a meeting he had recently had with Flomenhoft in Kansas City. The "meeting served primarily to focus on specific topics for prompt attention." These included whether Polls Creek was properly formed, whether Polls Creek had acquired title to the coal reserves as had been represented in the "offering circular," whether there was documentary proof evidencing the quality and quantity of coal in the Polls Creek reserves, whether Flomenhoft was aggressively pursuing an investigation of Aminex's mining activities and whether Flomenhoft was aggressively attempting to obtain information from Aminex.

Bressel also reported to plaintiffs on a November meeting he had at Aminex's corporate offices in Kentucky. The meeting was attended by Aminex's president and vice-president, Flomenhoft and several attorneys. Bressel informed the Jefferson partners that Aminex had admitted that it did not know when it would mine the quantities of coal projected in the investment offering materials. He also reported that Jerome Matusow, Aminex's president, was unaware of an agreement entitling Polls Creek to a preferred allocation of coal. Additionally,

[i]t was apparent from the discussion that the penalties being incurred are being attributed, apparently proportionally to each of the properties from which coal is being excavated. While Aminex claims to have records reflecting the quality and quantity of coal being produced from each property, Aminex has apparently made no effort to assess the penalties only against the inferior quality coal.

Further, Aminex asserted that it is using some higher quality coal from its reserves mixing it with poorer quality coal in order to improve the overall quality and reduce penalties. Aminex indicated that this procedure was beneficial to Polls Creek because less penalty was being suffered. I am concerned about these representations because at another point in the discussion statements were made that the Polls Creek properties were among the better producing mines. Also, it appears that Aminex could be manipulating the penalties in order to restrict repayment on the cash investment.

.    .    .    .    .

Despite the generally favorable response with which our demands were met, it was all just talk and possibly hollow promises. Many statements that were made by Aminex seemed occasionally to be inconsistent with one another. Also the impression is reasonable that many glib statements and promises were made for the sole purpose of pacifying those present.

Bressel concluded:

As of this date, some 3 weeks since the meeting in Lexington, none of the promises, documents and reports have been provided. At the meeting it was indicated that we could expect to begin receiving material the week after Thanksgiving. It may be that Aminex is merely inefficient, a not uncommon characteris-

tic of tax shelter management operations. Until some solid performance is obtained from Aminex I do not believe that we should relax our viligence [sic]. It may be that this is still a profitable investment, which will merely take longer to reach fruition than anticipated. To date, it appears that Aminex has been producing and accounting for coal production to serve its own best interest not the interests of Polls Creek.

Also in late 1977, Lewis Nerman read a newspaper or magazine article that was similar in substance to an article appearing in the December 20, 1977, *Wall Street Journal* reporting an IRS revenue ruling on deductions for payment of advanced royalties by coal leasing syndicates. The article reported that the IRS had finalized regulations allowing coal royalty deductions to be taken only in the year paid or accrued. The ruling stated: "Deducting the cumulative amount of minimum royalties paid by cash or negotiable note in the initial year of the lease is improper."

In January 1978, Bressel sent the Jefferson partners copies of materials he had received from Flomenhoft including a letter dated December 22, 1977, from Flomenhoft to the limited partners of Polls Creek. The letter stated:

> I have very recently received very disturbing information concerning Aminex, including information in an article in the December 12, 1977, *Philadelphia Inquirer*, indicating that Aminex may well have made misrepresentations or omitted to disclose material information to the partnership concerning its rights or the partnership's rights in the properties covered by the Sublease, the coal reserves on the property and Aminex's ability or intention to mine and sell coal in accordance with the agreements. Our concern has been enhanced by the total failure of Aminex to provide the information demanded from them concerning these matters.

Flomenhoft then disclosed that Polls Creek had initiated a § 10(b) and Rule 10b–5 securities fraud action against Aminex in federal district court in Chicago.

Also, Bressel sent to the Jefferson partners a copy of Polls Creek's complaint. The complaint alleged that Aminex had falsely represented that Aminex was "the lessee of all rights with respect to property" that were the subject of the agreement Aminex had with Polls Creek, that the leases for the property gave Aminex mineral rights to all mineable coal on the property, and that Aminex obtained the necessary consents to sublease the property to Polls Creek as stated in the agreement. Polls Creek further alleged that Aminex failed to disclose that there were serious questions about the title to the property and that Aminex never intended to mine the coal required by the agreement. Polls Creek requested that the agreement with Aminex be rescinded.

In Flomenhoft's letter sent by Bressel to the Jefferson partners, Flomenhoft warned that if Polls Creek obtained rescission, "[i]t is conceivable, if not likely, that the Internal Revenue Service would take the position that . . . the whole transaction must be 'unwound' and that everyone's 1976 Federal income tax returns must be amended, and all of the deductions must be given up . . . ." However, Flomenhoft noted that seeking rescission might put Polls Creek in a better position to get its money back. Flomenhoft urged all Polls Creek partners to consult with counsel and tax advisers "because of the significant potential consequences, including the possibility of recapture of past deductions." He also told the partners that Polls Creek had no cash and requested that they loan the partnership one percent of their original capital contribution.

On June 7, 1978, Bressel sent to the Jefferson partners more information that he had received from Flomenhoft, including a letter from Flomenhoft dated May 26, 1978. According to Flomenhoft, the "bad news" was that the IRS had begun to audit Polls Creek's 1976 federal partnership income tax return:

> At some point, perhaps within the next twelve (12) months, it is quite possible that the Internal Revenue Service will take the position that some or all of

these deductions are not allowable. This is despite the fact that I feel they are in fact allowable, but you may refer back to the Investment Memorandum to see any number of possible problems and arguments that could be raised by the Internal Revenue Service.

The "good news" was that in March 1978, the Securities and Exchange Commission (SEC) had filed an action against Aminex in federal district court in Washington, D.C. charging it with violations of §§ 10 and 13 of the Securities Exchange Act of 1934 and requesting the appointment of a receiver. Rudolph Giuliani had been appointed receiver. Flomenhoft also reported that in March 1978, Aminex had filed for reorganization under Chapter XI of the Bankruptcy Act. Flomenhoft noted that "[s]ome of you may have seen a note or squib in the *Wall Street Journal* on this." Although he conceded that bankruptcy "at first sounds terrible," Flomenhoft was confident that a bankruptcy proceeding was the "best thing that ever happened to us, because only with prior management 'out' can we ever get a 'fair deal.'" He then revealed:

I have been told that prior management, in the person of Messrs. Matusow and Hyman, "looted" the company, of somewhere between $2,000,000 and $9,000,000. Assuming those allegations to be correct, we have a "business fraud" here, but not one where in fact there is no coal available, but instead one where someone in control of a company is stealing the money of the company. That is money that would otherwise of course have gone to us (and the other partnerships, as well as some of it staying with Aminex).

Flomenhoft thought that Polls Creek had an "excellent chance" of recovering its money "[e]ven if it turns out that our contracts for the coal are not valid, namely, the leases were invalid or the Title Report we had from an attorney in Kentucky was forged or fraudulent...."

By this time, Bressel had serious doubts "that anymore money would be forthcoming because of the bankruptcy filed by

Aminex." He believed that if the Jefferson partners' 1976 federal income tax returns were audited, the deductions would be disallowed. He considered filing a lawsuit against Polls Creek or Aminex on behalf of the Jefferson partners.

In 1983 and 1984, the IRS issued to all plaintiffs notices of deficiency for their 1976 federal income taxes. The deficiencies resulted from the IRS' audit of Polls Creek:

Upon examination of the books and records of Polls Creek Associates it was determined that the allowable loss to be distributed was $22,610.00, instead of the $7,924,815.00 claimed on the partnership return.

. . . . .

(1) It is determined that the amount deducted as the partnership's loss attributable to royalties is disallowed because the amount and character of such has not been established, including but not limited to, a failure to establish:

(a) That the alleged events, transactions and expenditures ever occurred in fact or in substance;

. . . . .

(e) That you were a partner in the above partnership on or before October 29, 1976.

### *Undisputed Facts as to Claims of Plaintiffs Shaw*

Plaintiffs Lee and Cleo Shaw invested in mineral trusts which, like Jefferson, purchased partnership interests in Polls Creek. Eugene Mitchell was trustee of the trusts.

Mitchell received Flomenhoft's December 22, 1977, letter announcing the filing of the Polls Creek securities fraud action against Aminex and discussing the possibility that the deductions would be disallowed by the IRS. Mitchell also received Flomenhoft's May 26, 1978, letter discussed above. At that point, Mitchell concluded that "something funny and phony [was] going on.... I wondered how well Alexander Grant checked these guys out and I think we better get to hustling on this thing." On

July 11, 1978, Mitchell wrote to the Shaws: "The potential problems and complications are astounding for the partnership. The potential consequence to you is the loss of the 1976 tax write-off generated by the partnership. Only time will tell in this matter."

In 1984, the Shaws received a notice of deficiency from the IRS for their 1976 federal incomes taxes.

### Undisputed Facts as to Claims of Plaintiff Barney Karbank

Plaintiff Barney Karbank was never a Grant client. Karbank had learned about Polls Creek from one of the Nermans.

On December 6, 1976, Karbank signed a Polls Creek subscription agreement. The agreement stated that investment in Polls Creek "involves an extremely high degree of risk." It further stated that Karbank understood and accepted the "risks of disallowance of [the] income tax benefits" and that he "is capable of bearing the risk of disallowance of such income tax benefits."

Soon after he invested, Karbank learned that he was not a partner in Jefferson. When he telephoned Grant partner Joe Haith to complain, he was advised that because he was not a Grant client his investment had been assigned to Polls Creek Associates of Kansas City (Polls Creek, K.C.). Karbank was unhappy, but did not rescind his investment.

On December 30, 1976, Larry Bold, attorney for Polls Creek, K.C., wrote to the Polls Creek K.C. partners about the likelihood of an IRS challenge to a substantial portion of the partners' tax deductions. Bold stated:

The Internal Revenue Service indicated on October 29, 1976, that it would challenge any advance royalty by means of a non-recourse note unless the party making the payment by means of a non-recourse note had an obligation to do so by means of a contract executed before October 29, 1976. Polls Creek Associates, the Illinois Limited Partnership, did have a binding contract prior to October 29th. The Internal Revenue Service may challenge our deduction of this advance royalty on the basis that even though the partnership had a contract prior to October 29th, that we did not become members of that partnership until December, and therefore we did not meet the October 29th date.

Another basis the Internal Revenue Service might use to challenge the deduction would be to take the position that the delivery of a non-negotiable nonrecourse note from the partnership does not constitute "payment" of an advanced royalty. For your information, the payment of advanced royalties with respect to coal investments is a customary practice in the coal industry. However, prior to 1976 I am not aware of any advanced royalties with respect to coal investments which were made other than in cash. As a result, there are no tax cases determining whether the payment of an advanced royalty by means of a non-negotiable non-recourse note does constitute "payment." It is clearly proper to deduct advanced royalties paid in cash.

Consequently, while the partnership will deduct the entire advanced royalty on the partnership's 1976 tax return, it is quite likely that the Internal Revenue Service will audit this deduction sometime in the next two years. At that time the partnership (hopefully, the Illinois Limited Partnership) will be forced to defend its deductions. There will certainly be other coal investments of this type which will also be audited, and I would hope that the deductibility of the entire advanced royalty will be sustained.

In July 1977, Karbank received the first cash distribution from Polls Creek K.C. In an accompanying letter, Bold wrote:

As you know, we should have started receiving checks from this investment no later than February or March. When our checks did not arrive I began applying pressure on Howard Flomenhoft, the Chicago attorney who syndicated and promoted the investment, to do whatever was necessary in order to begin our monthly stream of checks. Finally, he was able to extract the first payment

which covers the months of January, February and March of 1977.

. . . . .

Even though we have now received our first check, I am not completely satisfied in my own mind that the documentation, production and sale reports, and other paper work, adequately protect our investment at this point in time. I am especially concerned since Aminex Corporation is late on making its payments and their [sic] financial condition may not be as liquid as we would like.

In September 1977, Bold received from Flomenhoft a second distribution for the Polls Creek K.C. partners. In a letter to the partners dated September 28, 1977, Bold expressed dissatisfaction with both the amount of the distribution and Aminex's report on mining activities:

Mr. Flomenhoft has been unable to obtain from Aminex an explanation as to why the amounts paid are lower than the contract amounts. Furthermore, the actual production as reflected on the enclosed report is approximately 35% of the production he anticipated at the time we made our investment. We projected selling 15,000 tons of coal each month to Dayton Power and Light Company, whereas the report reflects average sales of less than 5500 tons per month.

Needless to say, I am not satisfied with the documentation or explanations I have received to date and I am continuing to press Howard Flomenhoft for further details and explanations.

Bold also requested the Polls Creek K.C. partners to sign and return signature pages and forms authorizing him to investigate on behalf of the partnership.

In October, Karbank signed and returned to Bold the signature page and authorization. In an accompanying letter, Karbank wrote: "I would be less than candid if I didn't express my disappointment, not only with the inadequate documentation pertaining to the partnership, but the arbitrary manner in which some of the decisions were made ... from what I have seen so far, the entire matter is being handled in a very slipshod way." By this time, it ap-

peared to Karbank that "some of those things may not have been investigated as thoroughly as they should have been."

Karbank attended the October 21, 1977, meeting at which Flomenhoft discussed with several Jefferson partners the status of investments in Polls Creek. As a result of the meeting, Karbank thought "that many of [the] questions that came out had been addressed before the investment was made, or at least some assurance was given by the promoters along with Grant's people that they had used due diligence in investigating the investment they were recommending."

In a six page letter to the Polls Creek K.C. partners dated November 25, 1977, Bold again expressed concerns about the investment. He stated that he had met with Flomenhoft in October and had inquired about the following: whether Polls Creek was properly formed; whether it had acquired legal title to the coal as had been represented; whether there was evidence as to the quantity and quality of the coal reserves; whether adequate steps had been taken by Flomenhoft to obtain information about the quantity of the coal being mined; and whether Flomenhoft had taken steps to obtain accurate and detailed reports from Aminex. Among other things discovered in response to those questions, Bold disclosed that proper procedures might not have been followed in forming Polls Creek, that title insurance could not be obtained, that a second engineering report promised at the time of the investment had not yet been delivered, and that no arrangements had been made to verify the quantity of coal being mined or to determine whether the partnership was being paid for all coal removed from the property.

In June 1978, Bold advised the Polls Creek K.C. partners that he did not know if any coal was being mined from "our land," that Polls Creek had filed a lawsuit against Aminex, that the SEC had filed an action against Aminex, that Aminex's two chief operating officers had promised to repay the $1,200,000 they had stolen from Aminex, that the IRS was auditing Polls Creek's tax return and that it was "impos-

sible for anyone to determine the real status of our investment." Bold further stated: "It is quite likely that it will be several years before we have any idea as to whether we will make a profit on our investment, or whether our investment is worthless." Accompanying Bold's letter was Flomenhoft's May 26, 1978, letter providing "good" and "bad" news to the Polls Creek partners. In commenting on the IRS audit of Polls Creek, Bold stated: "I would anticipate that the agent handling the audit will initially propose to disallow substantially all of the deductions we claimed on our 1976 tax returns."

In 1983 or 1984, the IRS notified Karbank that the deductions he had taken on his 1976 tax return as a result of his investment in Polls Creek K.C. would be disallowed.

### Discussion

■ Comparing what plaintiffs knew by mid–1978 with the allegations of wrongdoing in the second amended complaint reveals that by mid–1978 plaintiffs discovered the fraud alleged in the complaint. For instance, plaintiffs allege in paragraph 30(a) of the complaint that Grant falsely represented that Jefferson and Polls Creek were "wise" economic investments and that "invested capital" plus a "profit" of at least 20% would be returned "within a reasonable period of time." By mid–1978, however, plaintiffs knew investment in Jefferson and Polls Creek was not "wise" and that the capital they invested plus a 20% profit were not going to be returned "within a reasonable period of time." In paragraph 30(b), plaintiffs allege that Grant falsely represented that there was no risk of losing the investments because of the "soundness" of the underlying coal leases, rights and contracts. By mid–1978, plaintiffs knew that the coal leases were not sound. In paragraph 30(c) and (d), plaintiffs assert that Grant falsely represented that the investments would provide "substantial tax sheltering deductions against current income" and that there was "no risk that the tax shelter deductions set up by [Grant] would be disallowed by the [IRS]." By mid–1978, plaintiffs knew that

if Grant represented there was no risk of disallowance, the representation was false. In fact, by mid–1978, plaintiffs knew that there was a significant risk that the promised tax shelter deductions would be disallowed by the IRS. By then, plaintiffs had received a copy of the Polls Creek complaint against Aminex requesting rescission of the agreement. Flomenhoft had told plaintiffs in his December 22, 1977, letter that if Polls Creek was granted rescission, the IRS would probably unwind the transaction causing disallowance of the deductions. Plaintiffs also knew that the IRS was conducting an audit of the Polls Creek partnership's federal tax return. Flomenhoft had warned plaintiffs in May 1978, that the IRS might disallow the deductions. He had referred plaintiffs to the Investment Memorandum for arguments the IRS could raise. By mid–1978, the attorney plaintiffs had authorized to investigate Polls Creek and Jefferson on their behalf believed that if the IRS credited the partners' 1976 tax returns, the deductions would be disallowed.

■ Plaintiffs also allege that Grant failed to disclose information it had a duty to disclose. For instance, plaintiffs allege that Grant failed to tell them 1) that the IRS and Department of Treasury in 1976 proposed amendments to regulations that would "disallow for any investment made, partnership formed and partners installed in partnerships after October 29, 1976, deductions for advanced royalties;" 2) that these amendments were adopted and made effective as of October 29, 1976; and 3) that the effect of these amendments was to eliminate the deductions plaintiffs had taken on their 1976 federal income tax returns because Jefferson and Polls Creek were formed after October 29, 1976, and because plaintiffs became partners in Jefferson and Polls Creek after October 29, 1976. Second Amended Complaint, ¶¶ 34(a), (d), (f), (g) and 51(a), (d).

The proposed 1976 amendments to the IRS regulations and the IRS' adoption of these amendments in 1977 were a matter of public record. Plaintiffs are presumed to know the tax regulations. *Cherry–Burrell*

*Corp. v. United States,* 367 F.2d 669, 674–75 (8th Cir.1966). Plaintiffs knew when they became partners in Jefferson and when Jefferson became a partner in Polls Creek. Therefore, plaintiffs knew in mid-1978 the essential facts that they assert Grant failed to tell them.

Accordingly, by mid-1978, plaintiffs had discovered the basis for allegations of fraud made in the complaint six years later. At the very least, a reasonable person would have been alerted by mid-1978 to the possibility of wrongdoing. Had plaintiffs exercised reasonable diligence they would have discovered the alleged fraud long before September 24, 1982. In fact, with what plaintiffs knew by mid-1978, they should have discovered the basis for the alleged fraud by mid-1978. Therefore, whether because plaintiffs actually had discovered the fraud or should have by mid-1978, the two years statute of limitations began running by mid-1978. Because the original complaint was not filed until September 1984, plaintiffs' claims under the federal securities laws are barred by the running of the limitations period.

Plaintiffs contend that the statute of limitations did not begin to run until 1984 when the IRS disallowed their deductions because: 1) Grant fraudulently concealed its wrongdoing; 2) plaintiffs had a fiduciary relationship with Grant; 3) plaintiffs had not suffered specific damages until after the IRS audit and disallowance; and 4) plaintiffs exercised due diligence and could not discover Grant's alleged wrongdoing until 1984.

■ Even if we assume as true those facts relied on by plaintiffs to support their fraudulent concealment argument, the statute of limitations was not tolled until 1984 as plaintiffs suggest. Regardless of Grant's actions, plaintiffs had discovered the fraud by mid-1978, or should have discovered the fraud from sources other than Grant had they used reasonable diligence. Grant's assumed concealment does not render meaningless the information that plaintiffs had by mid-1978 indicating the existence of the fraud they now complain about.

■ Plaintiffs also argue that the statute of limitations was tolled because of the fiduciary relationship they had with Grant. Plaintiffs point to reassuring statements made by Bressel, Flomenhoft and Bold as evidence justifying their failure to act earlier. Also, plaintiffs suggest that there was little reason to suspect wrongdoing because most plaintiffs had relied on Grant for tax and accounting services.

Admittedly, Flomenhoft, Bressel and Bold sprinkled their reports with hopeful statements. These hopeful statements did not justify ignoring the "facts" contained in the same reports. By mid-1978, the hopeful assurances had been swept away by a hurricane of negative facts such as Aminex's bankruptcy and receivership, Polls Creek's fraud action against Aminex, the IRS audit of Polls Creek and the SEC investigation of Aminex. *See General Builders Supply Co. v. River Hill Coal Venture,* 796 F.2d 8, 13 (1st Cir.1986). Accordingly, the limitations period was not tolled because of any fiduciary relationship that plaintiffs had with Grant.

■ Plaintiffs also argue that the statute of limitations did not begin to run until they were damaged, i.e., until the IRS disallowed the partners' deductions in 1983 and 1984.

In *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406 (9th Cir.1987), plaintiffs in 1976 and 1977 purchased interests in limited partnerships organized to acquire and develop coal leases in Utah. Plaintiffs were told that investment in the partnerships would entitle them to claim substantial deductions from ordinary income. In 1978, plaintiffs were notified that the IRS had questioned the commercial viability of the mining operations and the propriety of the deductions. *Id.* at 1410. Between 1978 and 1979, plaintiffs were informed of significant problems with the investments. *Id.* In 1982, the IRS disallowed the deductions. *Id.* at 1141.

On January 20, 1984, plaintiffs filed a lawsuit against the promoters, tax counsel and broker for the investments alleging violations of § 10(b) and § 17(a) of the federal securities laws of RICO and of various

state laws. The district court granted defendants' motion for summary judgment on the federal securities law claims because the claims were barred by the applicable two year statute of limitations.

On appeal, the Court rejected plaintiffs' argument that the statute of limitations was not triggered until plaintiffs were placed on actual notice of the fraud by the IRS' disallowance. "Appellants should have brought their action once they discovered or should have discovered the facts constituting their claim. Defrauded securities purchasers are not permitted to delay bringing an action while avoidable damages accrue." *Id.* at 1412. The Court also rejected plaintiffs argument that they were not injured until 1982 when their deductions were disallowed:

> Contrary to appellants' arguments, the nature of the investment as a tax shelter and the damages recovered for fraud in connection with such investments have no bearing on the commencement of the limitations period. The actual monetary loss sustained by appellants in 1982 by virtue of the IRS disallowance is not the type of injury recognized by securities law. Investors must bring their lawsuits when they should discover that they paid an inflated price for securities as a result of misleading statements or omissions. Whatever action the IRS ultimately takes does not affect defrauded investors' rights to damages. Appellants' damages were fully cognizable prior to the IRS decision. At the time appellants should have discovered the fraud, a trial court could have fashioned appropriate legal or equitable remedies.

*Id.* at 1413.

Here, even if plaintiffs invested for the primary purpose of claiming deductions on their 1976 federal income tax returns, plaintiffs did not have to wait until 1984 when the IRS disallowed the deductions to bring this action. Under federal securities laws, plaintiffs were "damaged" when they were allegedly induced by misrepresentations to invest in Jefferson and Polls Creek. Their cause of action accrued when they discovered or should have discovered the

alleged fraud in mid–1978. "Whatever action the IRS ultimately takes does not affect defrauded investors' rights to damages." *Volk,* 816 F.2d at 1413.

Finally, plaintiffs argue that despite the exercise of due diligence, they were unable to discover Grant's alleged wrongdoing until 1984. However, as previously discussed, plaintiffs either knew about Grant's alleged misconduct by mid–1978, or should have known about it had they exercised due diligence.

Accordingly, based on the factual record presented properly under Rule 56 and on the applicable law, Grant is entitled to summary judgment on Count II of the second amended complaint.

### Counts III through IX: State Law Claims

█ In Counts III through IX, plaintiffs allege violations of the Missouri Securities Act (Mo.Rev.Stat. § 409.411) and the Missouri Merchandising Practices Act (Mo. Rev.Stat. § 407.020), breach of fiduciary duties, fraudulent misrepresentations, negligence, civil conspiracy and prima facie tort. Plaintiffs seek to invoke pendent jurisdiction over these state law claims.

"The power to exercise pendent jurisdiction is grounded upon the existence of federal subject matter jurisdiction over some claim in the cause of action." *Kuhn v. National Ass'n of Letter Carriers, Branch 5,* 570 F.2d 757, 759 (8th Cir.1978). Because summary judgment will be granted in defendants' favor on the federal claims contained in Counts I and II, no basis remains for federal subject matter jurisdiction over the state claims asserted in plaintiffs' second amended complaint. Therefore, Counts III through IX must be dismissed for lack of subject matter jurisdiction.

### Order

For the foregoing reasons, it is hereby ORDERED that:

1) defendants' motion for summary judgment on Count I of the second amended complaint is granted;

2) defendants' motion for summary judgment on Count II of the second amended complaint is granted;  and

3) Counts III through IX of the second amended complaint are dismissed for lack of subject matter jurisdiction.