Michael L. ALBERT, et al., Plaintiffs,

v.

GRANT THORNTON, et al., Defendants.

No. 86-1237-CV-W-9.

United States District Court,
W.D. Missouri, W.D.

April 20, 1990.

Thomas C. Brown, Michael R. Thiessen, David R. Nachman, Brown & Thiessen, P.C., Kansas City, Mo., and John R. McFarland, James R. Keller, and Kenneth J. Mallin, Coburn, Croft & Putzell, St. Louis, Mo., for plaintiffs.

Howard L. Kastel, Alan S. Rutkoff, McDermott, Will & Emery, Chicago, Ill., and Gene E. Voigts, and Peter E. Strand, Shook, Hardy & Bacon, Kansas City, Mo., for defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SANCTIONS

BARTLETT, District Judge.

### I. Background

This is the third case to be filed against Grant Thornton (Grant), a national partnership of certified public accountants, arising out of investments in a tax shelter limited partnership known as Polls Creek Associates of Illinois (Polls Creek). Summary judgments in favor of Grant have already been entered by Chief Judge Scott O. Wright in *Wodlinger v. Bold*, [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) If 92,956 1986 WL 543 (W.D.Mo.1986) and by this court on the federal claims in *Nerman v. Alexander Grant & Co.*, 671 F.Supp. 649 (W.D.Mo.1987), modified, 683 F.Supp. 1293 (1988).

On November 18, 1986, plaintiffs filed this case against Grant and two of its partners alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Securities Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5. In addition, plaintiffs assert six claims under Missouri law; breach of fiduciary duties (Count III); fraudulent misrepresentation (Count IV); negligence (Count V); violation of Missouri's Merchandising Practices Act, Mo.Rev.Stat. § 407.025 (Count VI); prima facie tort (Count VII); and civil conspiracy (Count VIII).

Plaintiffs allege in their complaint that defendant Grant "solicited, advised and recommended to plaintiffs" that they invest in Polls Creek either directly or through Polls Creek Associates of Omaha (Polls Creek Omaha) or Polls Creek Associates of Double M–S (Double M–S). Grant allegedly "provided to plaintiffs tax, accounting and financial advice and recommendations about the consequences of this tax shelter." Before plaintiffs purchased interests in these partnerships, defendants allegedly made various "misrepresentations and intentional omissions" that plaintiffs contend induced them to invest including representations that investment in these partnerships "was a wise investment for economic return, and that invested capital and a profit of at least 20 percent would be returned to plaintiffs within a reasonable period of time" (¶ 30(a)); that there was little, if any, risk of plaintiffs losing their investments because "of the soundness of the underlying coal leases, rights and contracts" (¶ 30(b)); that investment in these partnerships would provide plaintiffs "with substantial tax-sheltering deductions against current income several times the amount actually invested" (¶ 30(c)); and that there was "no risk that the tax shelter deductions set up by defendants for plaintiffs would be disallowed by the Internal Revenue Service." ¶ 30(d).

Plaintiffs allege that they decided to invest because of the combination of these alleged misrepresentations. The "misrepresentations and intentional omissions" made by defendants were material to the purchase of interests in Polls Creek. The plaintiffs were "misled and deceived" to "their detriment by inducing their invest-

ment" in Polls Creek Associates of Omaha, Double M–S and Polls Creek. ¶ 43.

"The IRS disallowed in 1983 and 1984, all of plaintiffs' tax deductions based upon investment in Polls Creek Associates of Omaha, Double M–S and Polls Creek...." ¶ 55. As a result, plaintiffs claim damages "including but not limited to significant tax liability for plaintiffs, liability for interest and penalties assessed against plaintiffs, and lost opportunity value of great sums of money." Additionally,

> plaintiffs have lost the initial investment each made in the partnership, did not receive any return on their investments as represented by defendants, have expended great sums in legal and accounting fees for representation in audits conducted by the IRS, have paid additional accounting fees to defendants Haith, Burke and Grant Thornton that plaintiffs would not have had had defendants not misrepresented facts that extended the life of Polls Creek Associates of Omaha and Polls Creek, and have lost the value of deductions as promised by defendants.

*Id.*

On August 14, 1987, this case was consolidated with the *Nerman* case. In *Nerman* plaintiffs also asserted claims for violations of federal and state law arising out of failed investments in Polls Creek. After the plaintiffs in *Nerman* filed a second amended complaint, Grant moved for summary judgment on the entire amended complaint. On September 24, 1987, I granted Grant's motion and dismissed the federal claims.

Thereafter, Grant filed a motion for summary judgment in this case. Prior to filing a response to Grant's motion, plaintiffs moved to voluntarily dismiss the federal claims. On January 6, 1988, plaintiffs' motion was granted and the federal claims were dismissed. As a result, the only claims remaining in this case are the claims for violations of state law. Jurisdiction over these claims exists on the basis of diversity jurisdiction. *See* 28 U.S.C. § 1332.

In response to plaintiffs' request, oral argument was held on July 7, 1988, on Grant's motions for summary judgment on the state law claims asserted in this case and in the *Nerman* case. Grant's motion for summary judgment on the state law claims in *Nerman* will be the subject of a separate order filed contemporaneously with this order.

## II. *The Applicable Standards for Determining When the Statute of Limitations Begins to Run*

In its motion for summary judgment, Grant contends that plaintiffs' state law claims are barred by the statute of limitations. Grant argues that these claims are subject to the five year statute of limitations set forth in Mo.Rev.Stat. § 516.120. Grant asserts that plaintiffs discovered their claims well before November 1981. Therefore, according to Grant, the claims alleged in the complaint filed November 18, 1986, are barred by the statute of limitations.

Plaintiffs do not dispute that each of the state law claims is subject to the five year statute of limitations of Mo.Rev.Stat. § 516.120. Rather, plaintiffs vigorously argue that under Mo.Rev.Stat. § 516.100, the five year period did not begin to run until 1983, only three years before plaintiffs filed their complaint. Therefore, plaintiffs maintain that the complaint was filed timely.

As plaintiffs acknowledge, the state law claims are subject to the five year statute of limitations. The five year limitations period begins to run for each cause of action when the cause of action accrues. § 516.100.

> Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage

may be recovered, and full and complete relief obtained.

The word "ascertain" has always been read as referring to the fact of damage rather than to the precise amount. *Dixon v. Shafton*, 649 S.W.2d 435, 438 (Mo. en banc 1983).

■ For claims of negligence, damage is sustained and capable of ascertainment under § 516.120 "whenever it is such that it can be discovered or made known." *Kueneke v. Jeggle*, 658 S.W.2d 516, 517 (Mo. App.1983). However, "the statute of limitations begins to run once the fact of damage is capable of ascertainment, even though the amount of damage is not yet ascertainable." *Zero Manufacturing Co. v. Husch*, 743 S.W.2d 439, 441 (Mo.App. 1987) (emphasis supplied). *See also Brower v. Davidson, Deckert, Schutter & Glassman, P.C.*, 686 S.W.2d 1, 4 (Mo.App. 1984).

Plaintiffs filed their complaint on November 18, 1986. Therefore, for plaintiffs' negligence claim (Count V), the statute of limitations inquiry is whether by November 18, 1981, the damages complained about could have been "discovered or made known."

■ For a fraud claim, a different standard is applied in Missouri for determining when the statute of limitations begins to run.

> A cause of action for fraud accrues at the time the defrauded party discovered or in the exercise of due diligence, should have discovered the fraud.... The plaintiff maintains the duty to make inquiry to discover the facts surrounding fraud. Where the means of discovery exist, the plaintiff will be deemed to have known of the fraud so as to begin the running of the statute....
> Where a relationship of trust and confidence exists between the parties, the duty required of a plaintiff to make inquiry and discover the facts surrounding fraud is qualified. *Foster v. Petree*, 347 Mo. 992, 149 S.W.2d 851 (1941). Because the fiduciary relationship creates a false sense of security, only *actual* discovery

of the fraud serves to begin the period of limitations. *Foster*, 149 S.W.2d at 853; *Briece v. Bosso, supra* [158 S.W.2d 463 (Mo.App.1942)].

*Burr v. National Life & Accident Insurance Co.*, 667 S.W.2d 5, 7 (Mo.App.1984).

■ Defendants argue that the reasonable inquiry standard rather than the actual discovery standard should be applied in this case. Defendants rely on decisions such as *Koke v. Stifel–Nicolaus & Co.*, 620 F.2d 1340, 1343 (8th Cir.1980). In *Vanderboom v. Sexton*, 422 F.2d 1233 (8th Cir. 1970), cited in *Koke*, the court determined which standard should be used for deciding when the statute of limitations begins to run for claims involving violations of federal securities laws. The court in *Vanderboom* stated that "where the cause of action is federal in origin but a forum state's statute of limitations is being used and the action is equitable in nature, federal law applies in regard to determining the date on which a statute of limitations begins to run." *Id.* at 1240. The court then stated that federal law since 1875 had been that in cases involving fraud, the statute of limitations cannot "be said to begin to run until the fraud is or should have been discovered."

> We feel that the remedial policy expressed by Congress in enacting the securities legislation would best be served by making any statute of limitations run only from the date of the discovery of the fraud or from the date the fraud upon reasonable inquiry should have been discovered.

*Id.*

Therefore, the standard for determining when the limitations period begins to run advocated by defendants is the standard for federal securities fraud claims.

Relying on *Martin v. Crowley, Wade and Milstead, Inc.*, 702 S.W.2d 57 (Mo. banc 1985), defendants suggest that the *Vanderboom/Koke* standard should be applied in determining when the statute of limitations begins to run for the fraud based state claims. *Martin* involved a claim for professional *negligence*, not fraud. Nothing in the *Martin* decision

suggests that anything other than actual discovery of the fraud will begin the running of the statute of limitations in a common law fraud case involving a fiduciary relationship.

Grant does not challenge plaintiffs' position that a fiduciary relationship existed between plaintiffs and Grant throughout the period of Grant's alleged fraudulent conduct. Therefore, the statute of limitations inquiry for plaintiffs' claim for fraud (Count IV) is whether by November 18, 1981, plaintiffs had discovered the fraud alleged in the complaint. Because Grant does not disagree with plaintiffs' contention that the claims advanced in Counts III, VI, VII and VIII are "fraud based," the same actual discovery standard applies to those counts as well.

### III. *The Factual Record* [1]

#### a. *Facts As to the Claims of Plaintiffs Myron Milder and Jerome Milder*

In December 1976, plaintiffs Myron and Jerome Milder formed a general partnership with Ray Simon, their lawyer and close friend, for the purpose of investing in Polls Creek. The partnership was originally known as Double M–S Participation and, later, as Polls Creek Associates of Double M–S (Double M–S).

Simon did not represent the Milders in connection with their investment. However, he was designated as the agent of Double M–S to receive "all notices" about Polls Creek. When Simon received documents from Howard Flomenhoft, the promoter of Polls Creek, he would either inform the Milders about the documents or send copies of the documents to one of them.

Before investing in Polls Creek, Simon had received the "Investment Memorandum for Polls Creek Associates." The Investment Memorandum described the various risks associated with investing in Polls Creek. (The risks described in the Memorandum are summarized in the *Nerman* order of September 24, 1987. See 671 F.Supp. at 654–55.) Simon reviewed the

Memorandum only superficially. He concluded, however, that investment in Polls Creek was very questionable. He specifically had concerns about the tax aspects of the transaction and whether the deductions would be allowed. Despite these doubts, he was certain Grant had made an independent analysis and that Grant partner Hubert Rosenblum would not have suggested the investment unless it was sound. Simon discussed his doubts with the Milders before they invested.

On December 15, 1976, Jerome Milder signed the subscription agreement for Polls Creek but does not remember reading it before he signed it. The agreement stated among other things that investment in Polls Creek involved an "extremely high degree of risk" including the risk of disallowance of "income tax benefits which serve to offset potential economic losses." Both Jerome and Myron Milder have testified that the primary reason they invested in Polls Creek was to obtain tax benefits.

In June 1977, Simon sent Myron Milder a copy of a letter from Flomenhoft dated June 21, 1977, explaining why partners in Polls Creek had not received any payments. Flomenhoft stated:

> I had hoped not to send this letter until I also enclosed checks. Checks are still not ready to go out, and what we are talking about is checks for actually three (3) months, for the period ending in February [no coal was apparently sold, or, more accurately, no proceeds were received on coal sold, for January in January], in May, in April and in March, checks due 3/25, 4/25 and 5/25.

Flomenhoft continued that the "real purpose" of his letter was twofold:

> 1. To apologize to everyone for the various delays. I am not going to go into the stories and reasons and explanations of why the delays, but I must assume responsibility here at this office for the fact that there have been delays, because a number of documents were apparently

---

1. The "Factual Record" portion of this opinion consists of facts the parties say are "undisputed," supplemented by "disputed" facts presented by the plaintiffs and taken to be true for the purpose of ruling on this motion.

not transmitted from this office when they were supposed to be, even though they were all executed and signed, and there have been all sorts of problems in making sure that the documents we are dealing with are the correct ones.

2. To reassure everybody that everything is in fact alright, [sic], that there are no problems, that I am here, nowhere else, that I am available by telephone or by letter, that in fact I anticipate everything straightening out within the next few weeks and checks coming out, and once we get that first step taken, the major step, that checks will flow regularly, monthly, with no further problem.

On the copy of the letter sent to Myron Milder, Simon wrote the following: "The first Dear John letter—if you understand the double talk your [sic] a better man than I Gunga Dinn." Myron Milder, however, was not concerned about Simon's note because he felt that the tax benefits, the primary reason he invested in Polls Creek, were still secure. Myron Milder thought that Simon was just being a "Gloomy Gus."

In July 1977, Double M–S received a distribution from Polls Creek. Simon sent each of the Milders his share of the distribution, together with a copy of the Polls Creek check. On the copy of the check, Simon wrote the following:

I have made a division of the check for which remittance enclosed—and written the letter indicated to Flom[enhoft]—I am really not at all concerned with the issue in this instance. But I do not want it to happen through a deduction from our check again without our prior approval. *Incidentally, save your money. I have an idea that your [sic] going to have some sizable tax to pay for 1976!*

(Emphasis added.)

Simon was concerned about Flomenhoft's lack of professionalism. However, his reference to saving money for tax purposes referred back to his initial concerns about the tax aspects of the investment. When Jerome Milder read Simon's comment he knew that Simon thought the deductions might be disallowed. Myron Milder was not concerned because Simon was not fa-

miliar with his tax situation. According to Myron Milder, Simon's note was "just another one of [Simon's] funny little things."

In November 1977, Flomenhoft sent a status report to all limited partners of Polls Creek. Among other things, the November 22, 1977, Flomenhoft stated that Polls Creek had only received a few "cryptic" reports from Aminex Resources Corporation, the mining operation in Kentucky, to use in determining the amount of coal sold to the partnership and the net proceeds to which Polls Creek was entitled; that Aminex had apparently failed to perform its obligations under the contract mining agreement; that Aminex had provided inadequate excuses for its failure to meet minimum tonnage requirements; that coal which had been mined was of inferior quality and would, therefore, prevent any substantial cash flow for some time; that Aminex did not remember or did not recognize a priority agreement under which Polls Creek was supposed to receive preferred treatment over other partnerships having mining contracts with Aminex; and that Aminex was not in a position to honor the priority agreement in any event. The report concluded: "As a result of these circumstances, we must seriously consider litigation or arbitration proceedings against Aminex. It may be that Aminex will provide us with the information and funds demanded within the next week or so and will sufficiently increase its coal production so that litigation can be avoided. If the Aminex response is unsatisfactory, we will have to seriously consider commencing litigation."

Simon sent Flomenhoft's status report to the Milders with the following handwritten observation: "The beginning of the tale." Jerome Milder guessed that Simon meant that someone was "weaving a yarn" to them. Jerome Milder thought Simon was "a very pessimistic person." Myron Milder did not know what Simon really meant but he was not concerned about the quality or quantity of the coal mined or about the consideration of litigation against Aminex. Myron Milder had already received his tax benefits. Therefore, he passed it off as

"another one of [Simon's] sweet smart little remarks."

In listing all the ways Aminex was in default in a status report to the Polls Creek limited partners dated December 22, 1977, Flomenhoft stated:

In addition, I have very recently received very disturbing information concerning Aminex, including information in an article in the December 12, 1977, *Philadelphia Inquirer*, indicating that Aminex may well have made misrepresentations or omitted to disclose material information to the partnership concerning its rights or the partnership's rights in the properties covered by the sublease, the coal reserves on the property and Aminex's ability or intention to mine and sell coal in accordance with the agreements. Our concern has been enhanced by the total failure of Aminex to provide the information demanded from concerning these matters.

Flomenhoft disclosed that Polls Creek had initiated an action under federal securities laws against Aminex in federal district court in Chicago. A copy of the complaint was enclosed in which Polls Creek alleges that Aminex and the individual defendants made numerous misrepresentations of material facts and did not disclose many material facts. Flomenhoft discussed the possibility of Polls Creek declaring the lease in default and requesting the return of all funds deposited by the partnership.

The problem with that has to do with the effect for Federal income tax purposes. It is conceivable, if not likely, that the Internal Revenue Service would take the position that if we demanded and received "rescission," the whole transaction must be "unwound," and that everyone's 1976 Federal income tax returns must be amended, and all of the deductions must be given up (outside of eighty percent (80%) of the total deductions). However, requesting rescission may put us in a better position with respect to recovering our money, namely, it may be possible that urging that remedy and achieving it would "impress a trust"

upon the monies given to Aminex, rather than us being simply a general creditor.

Simon also received, on behalf of Double M–S, a letter from Flomenhoft dated May 26, 1978. According to Flomenhoft, the "bad news" was that the IRS had begun to audit Polls Creek's 1976 federal partnership income tax return. Other "bad news" reported by Flomenhoft included the possibility that the IRS "will take the position that some or all of these deductions are not allowable." Flomenhoft referred the partners to the Investment Memorandum "to see any number of possible problems and arguments that could be raised by the Internal Revenue Service." He also warned that if the IRS takes the position that some or all of the deductions are to be disallowed, and the partnership disagrees with that position, "then the audit immediately shifts down to each partner, instead of [to] the partnership." (Other aspects of this "good news/bad news" letter are summarized in the *Nerman* September 24, 1987, order. *See* 671 F.Supp. at 658–59.) Neither Myron nor Jerome Milder remembered seeing the May 26, 1978, letter.

In April 1979, Simon received a letter from Flomenhoft dated April 16, 1979, in which Flomenhoft reported, among other things, that a settlement had been proposed in the Polls Creek's securities fraud action against Aminex under which Polls Creek would not have "the right to any specific parcel of land or any specific coal;" that the court presiding over the Aminex bankruptcy proceedings "has seen fit to throw out all of the preexisting mining contracts" which contained favorable terms for mining the partnership's coal; that Flomenhoft expected the IRS agent conducting the audit of Polls Creek to disallow all deductions taken by the partnership in 1976; and that each partner in Polls Creek soon would receive a bill to pay a share of the legal fees incurred by Polls Creek in the IRS audit. In part, Flomenhoft stated:

That audit will result, in my opinion, of [sic] a disallowance at the Agent level, by the Internal Revenue Service Agent, here in Chicago, of all deductions claimed in 1976 by Polls Creek Associates. That is neither unexpected nor surprising in

any way, because the Agent simply is not going to take responsibility for approving over $7,800,000 of deductions. However, I feel we have an excellent chance of sustaining these deductions at a higher level. I am no more pessimistic (nor optimistic) about the success of the tax write-offs here than I was originally.

Simon regarded Flomenhoft's letter as another communication that the investment would be unsuccessful. As a result, he reviewed the letter only "very superficially," and paid "little attention to the details." Simon did not believe there was any use in "wasting time on a transaction that [he] had serious doubts about from the beginning."

In a letter dated June 1, 1979, Simon and both Milders were asked to loan money to Polls Creek to enable it to continue the securities fraud litigation against Aminex. Myron Milder and Jerome Milder each sent $125 to Flomenhoft. Simon refused to contribute, telling Myron Milder that he would not send "good money after bad."

In December 1980, the Milders signed consents for extensions of time within which the IRS could assess additional taxes with respect to their 1976 tax returns. The consents stated: "The amount of any deficiency assessment is to be limited to that resulting from ... (2) any adjustments to your share of any item of income, gain, loss, deduction, credit and/or other distributions from [entities] known as: Polls Creek Associates of Double M–S...."

In March 1981, Myron Milder received an IRS examination report showing adjustments to his 1976 return because of his investment in the Double M–S partnership. As a result of the adjustments, the IRS calculated that Myron Milder owed $25,023 in additional taxes. Despite the examiner's report, Myron Milder still thought the deductions were viable since the government had not proven that he owed the additional taxes. Myron Milder believed that "nothing is over till its over, and this apparently, wasn't over."

Jerome Milder received a similar examination report from the IRS in April 1981, stating that he owed $29,348 in additional taxes as a result of the disallowance of his Polls Creek deductions. Jerome did not think much about it because "always I left things like this to my professional [Rosenblum]...." He thought that an appeal might be possible and he "might be able to come up with some different evidence, I guess. I really relied on Hub Rosenblum." He knew that if the appeal were unsuccessful he would have to pay additional taxes.

In May 1981, Simon received a letter from Flomenhoft dated May 16, 1981, which stated that Polls Creek was still in a "negative" position:

In other words, after taking the gross receipts for coal mined and delivered and sold, and subtracting all the allowable costs, you end up with a negative figure, so "no cash to us." I still feel the same way that I did 37 months ago, 25 months ago, 13 months ago and one month ago, and that is that, unless and until the price of coal increases substantially, without a concomitant increase in the cost of mining coal, we are not going to see any money.

Flomenhoft also reported that the two officials at Aminex who "had put it into bankruptcy and created a number of the problems here" had been found guilty in felony trials in federal court in New York:

My understanding also, from third parties, is that [the officials] received a substantially reduced sentence in return for agreeing to say that everyone else who was involved was involved in fraudulent activities, which could possibly be true with respect to other partnerships other than those with which I had any involvement; I can only comment upon my own situation.

In addition, Flomenhoft reported that the IRS had completed its investigation and had determined that all deductions taken in 1976 as a result of investments in Polls Creek should be disallowed. Enclosed with the letter was a full copy of the 23 page Revenue Agent's Report explaining the multiple bases on which the IRS had concluded that the deductions should be disallowed.

As I did make clear several years ago, the Internal Revenue Service audit (for 1976) was over before it began, namely, as far as the Internal Revenue Service was concerned, there were no deductions available and allowable here, and the only real issue was, from their point of view, the bases for disallowance. I am enclosing a copy of the "RAR," the "Revenue Agent's Report," from the Internal Revenue Service with respect to Polls Creek Associates and the disallowance of the 1976 deductions. A number of you have seen all of this already, a great number of you may have seen parts of this, but now you have at least what I received, and I received this only very recently. Less than one year ago, a major question has been raised about whether the partnership was in existence and had a binding contract as of October 28, 1976. That issue is still unresolved and is a major problem for me personally because of the tremendous time it has taken to continue to deal with this, and this issue is far from over.

In a postscript, Flomenhoft stated: "If you have not been involved with the Internal Revenue Service on an audit of your 1976 Federal income tax return (and an asserted disallowance of the deductions from Polls Creek Associates), I would be surprised, in light of the experience of most everyone else." Simon earlier sent a copy of this letter to the Milders or telephoned them and summarized it.

In March 1983, the IRS issued Notices of Deficiency to Myron and Jerome Milder stating that the deductions they had taken on their 1976 tax return as a result of their investment in the Double M–S partnership would be disallowed.

*b. Facts As to Claims of Plaintiffs Gerald Livingston Nels Eliason, Bernard Magid and Michael Albert*

Plaintiffs Gerald Livingston, Nels Eliason, Bernard Magid and Michael Albert were partners in Polls Creek Omaha which, on December 27, 1976, became a limited partner in Polls Creek.

On July 20, 1977, Magid wrote the following letter to Flomenhoft after Rosenblum said that he could not give him any information because the home office did not want him to talk.

I am writing to you as a member of the Omaha Associates in request of information. Your letter dated 24 March which was sent out with the report indicated that we would have monthly reports as well as cash distributions. As yet I have received neither form of communication. I have discussed this with Mr. Rosenblum who cannot give me any information. I am writing to you in some degree of consternation as to what is going on with this group. Hoping to hear from you in the extremely near future.

Magid received no response to his letter.

By letter dated August 25, 1977, addressed to each partner in Polls Creek Omaha, Flomenhoft stated:

I have been informed by an attorney representing Alexander Grant & Co., Inc., the employer of Hubert I. Rosenblum, that they do not wish any of their employees to be involved with partnerships such as this, and that Mr. Rosenblum is not to be an Agent of the partnership and is not to be used as the address of the partnership.

Flomenhoft then told the partners that they would have to establish a new address for the partnership. He stated that he anticipated receiving "in the very near future" an additional check for Polls Creek but that he could not send out the check for Polls Creek Omaha unless "I have from you, in writing, signed by all partners, the new address of the partnership and the new address to which to send all further and future communications." Flomenhoft also reminded the partners that a new checking account for Polls Creek Omaha was going to be established. "Each partner should consent to the closing of the checking account at The American National Bank & Trust Company of Chicago and each partner should state that neither Hubert L. Rosenblum nor myself is an authorized Agent of this partnership." Flomenhoft's letter made Eliason think "that the

coal mine itself was a fraud or something was going on."

In early September 1977, Michael Levy, an Omaha lawyer, was asked by Bill Pomeroy, a partner in Polls Creek Omaha, if Levy would be interested in representing the partnership. Pomeroy advised Levy that Polls Creek Omaha had received a communication from Flomenhoft which caused the partners to be concerned that "perhaps the coal mine was not really a coal mine." In varying degrees, the partners were concerned about what was going on with Polls Creek. Levy thought the major question that he was being asked to answer was whether the mine really existed. After Levy agreed to represent the partnership, the partnership agreement was amended to provide that Levy's office would be the principal office of the partnership.

By letter dated September 2, 1977, Levy informed Flomenhoft that he had been retained to represent Polls Creek Omaha. In his letter, Levy requested that "[a]t such time as your duties as authorized agent of the partnership have been concluded, I would request that I be furnished with a full accounting of all transactions which have occurred during the time you have served as agent." On September 8, 1977, Flomenhoft responded by informing Levy that he had no documents constituting an accounting because he had sent everything to Rosenblum. Levy then wrote to Rosenblum requesting the accounting and partnership records. Levy assumed that Rosenblum sent what he requested.

On October 4, 1977, Levy sent to the partners of Polls Creek Omaha a copy of a report dated August 29, 1977, from Flomenhoft to all limited partners of Polls Creek and a check for $21.47. Flomenhoft stated in the report that after a "great deal of effort" he had obtained from Aminex a " 'report' for the coal mined and shipped and sold and the cash received for the period through July of 1977." He also stated:

I have no way at this moment of verifying how these figures were obtained or the accuracy or the correctness of them.

I do note that the amount of coal mined is substantially less than originally anticipated, perhaps 35%—40% of what was originally anticipated, and I also note that there are some serious problems in terms of adjustments being made here which were not anticipated previously.

On October 31, 1977, Levy wrote to Flomenhoft:

Pursuant to our telephone conversation of this date, it is my understanding that you received no meaningful reports from Aminex Coal Development Corporation and that this company has failed to cooperate with you in any manner concerning your requests for information to verify the accuracy of the disbursements already received.

You have informed me that you have retained counsel for the purpose of making a demand upon Aminex for the production of records and that failing to receive the same, litigation will be commenced. You have further informed me that I will be receiving a copy of the demand letter so that I may forward the same to the members of Polls Creek Associates of Omaha.

Levy's letter caused Eliason to think Polls Creek was a fraud but Eliason testified that he "did not think the tax deductions were phony."

During October 1977, Levy was concerned about what was going on at the mine. "Is there a mine? Do we have a—do we have a legitimate mining operation? Is there coal? Is Aminex real? Who are these people?" Levy deposition at 35. Levy proposed to the Polls Creek Omaha partners that he go to Lexington, Kentucky, to meet with Aminex. Again, the partners had various levels of concern. For instance, Eliason believed Levy was going to check out rumors about the existence of the mine. This made him suspicious but he was not concerned about the prior year's tax deduction.

On November 16, 1977, Levy went to Lexington, Kentucky, with Flomenhoft and representatives of two Kansas City partnerships which also had invested in Polls Creek. After his visit, Levy sent a written

report to the Polls Creek Omaha partners. Levy told the partners that the meeting was attended by Flomenhoft, two attorneys from Kansas City representing the limited partnership that had invested in Polls Creek and "Jerry Fishman, an attorney from Chicago who has been retained by Flomenhoft in the event any litigation is commenced against Aminex or Alexander Grant...." Levy wrote that although over the last year he and the attorney from Kansas City had suspected that the entire Aminex operation was a sham, he "came away from the meeting with some degree of confidence that this is not the case." Nonetheless, Aminex seemed to be "rather nickel and dime and highly disorganized" with no controller and no authorized book-keeping. Levy believed that Flomenhoft is "over his head in this venture and has been guilty of failing to follow up on work that could have eliminated the problems which have been experienced over the last year." Levy reported that Aminex would not honor a "crucial" priority agreement because of "problems with the SEC and the IRS." Levy further disclosed:

Flomenhoft was made aware by myself and the Kansas City attorneys that in the event litigation was commenced, that he could reasonably anticipate that he would be a party defendant along with Aminex and Alexander Grant and, I believe, we have his attention in that he will follow through from now on. We have discussed the "report" which Aminex had been furnishing and which is the ledger sheet that contained really no information, and it appears that this document will have to be completely reworked as it was computed using the wrong set of documents. There are other syndications that use a completely different set of documents than Polls Creek is using and someone within Aminex' organization dropped the ball and failed to distinguish between Aminex' agreement with Polls Creek and Aminex' agreement with others. It is quite possible that upon recomputation the figures, additional monies will be owed to Polls Creek. Matusow and Hyman committed themselves to having this work done within the next

two weeks and promised in the event monies are due Polls Creek, they will be forthcoming immediately. It is at this point that I think we will be able to determine which direction this matter will take. Flomenhoft seems to feel that the recomputation should show a substantial indebtedness from Aminex to Polls Creek and that when Aminex discovers this fact, they may be reluctant to carry forward their promise to make payment. If this is the case, we will be in court.

　　·　　　·　　　·　　　·　　　·

I think that the next two to three weeks should tell whether problems are on the way to being resolved, however, I think everyone should realize that we are not out of the woods and that there is a substantial risk that this entire venture will prove unprofitable. I do feel that the meeting was profitable in that it did exhibit to both Aminex and Flomenhoft that, at least as far as these three partnerships are concerned, we will not go away by being ignored. The two attorneys from Kansas City and myself have agreed to keep in close touch and share whatever information we may obtain and also share our thoughts as to what direction should be taken in the event it appears that affirmative action should be taken by the limited partners.

Magid considered the lawyers' threat of litigation against Aminex and Grant as "just a group of lawyers [getting] together and flexing muscle." He discussed it with Rosenblum who told him that "it will work itself out." Magid also did not find the priority agreement issue upsetting because he thought it could be resolved to his benefit. Eliason began to believe that the investment was a "phony deal." After Levy's trip to Kentucky, Eliason knew that litigation against Grant was a possibility. Nevertheless, he did not believe that his 1976 tax deductions would be jeopardized even if the entire operation turned out to be a sham. Eliason's faith in Grant was not shaken by the information he received in November 1977. Albert thought that

Levy's report said "in a round about way" that everything was fine.

On December 24, 1977, Levy again wrote to the partners of Polls Creek Omaha. Levy's letter was accompanied by a copy of Flomenhoft's December 22, 1977, status report and a copy of the securities fraud complaint filed by Polls Creek against Aminex. (These documents, also received by plaintiffs Jerome and Myron Milder of the Double M–S partnership, are discussed above.)

Levy's letter included the following observation: "I would urge all of you to carefully review all documents, but particularly the memorandum of December 22. It is apparent that the deal is beginning to come unstuck and that decisions must be made by the partnership within the next two weeks." The "deal" Levy was referring to was an agreement that he thought had been reached during his meeting at Aminex with Flomenhoft and Aminex officials. Levy continued: "I believe that a meeting of the partners would be appropriate at this time as this is probably the most effective method of arriving at a course of action."

Albert does not recall receiving any documents about Polls Creek in November/December 1977. In fact, Albert testified that he did not recall receiving any documents that caused him any concern. No matter what he got, he would not have been concerned unless Rosenblum said he should.

By December 1977, Eliason concluded that there was fraud in connection with Polls Creek. At that time Eliason felt that Grant had done a "good job" on selling the tax shelter but had not bothered to investigate the coal operation because the selling job had been so successful. Thus, in December 1977, Eliason believed that Grant "deserve[d] to be sued twice"—once for the failure of Polls Creek to deliver the promised economic return and once for the alleged representations about the tax benefits.

On January 16, 1978, Levy sent to the partners of Polls Creek Omaha copies of newspaper articles which had appeared in the *Philadelphia Inquirer*. These articles had been referred to by Flomenhoft in his December 22, 1977, status report as among the documents received by Polls Creek which indicated fraud by Aminex. The articles, titled "5 Tax Shelters and the Shady Ties That Bind Them" and "Making Millions: He Built a House of Cards on Coal," described the "peddling" of tax shelters based on "dubious, sometimes fraudulent coal mining ventures:"

> The schemes offer investors tax deductions of as much as six times their cash investments-deductions that the IRS seems certain to disallow in audits to come. And at least some of the schemes are based on coal mining rights that don't exist.

> What emerges from the Inquirer's six-month investigation of the coal tax-shelter schemes has all the appearances of one of the biggest swindles in U.S. history. To date, promoters have taken in what appears to be substantially more than $300 million in cash from investors who hope for tax write-offs of more than $1 billion.

After describing the "dubious legality" of Aminex's mineral rights, one of the articles continued:

> Despite these substantial title problems, Aminex proceeded to use the land in question to make millions of dollars—dollars handed over by investors eager to acquire enormous tax write-offs. On October 28, 1976, [the president of Aminex] assigned the spurious coal holdings to eight limited partnerships organized in New York and Illinois.

Additionally, one of the articles described the involvement of "federal agencies:"

> Federal agencies looking into the Aminex deals are investigating the possibility that some of the documents were backdated to exempt the deal from the new IRS ruling.

> But investigators are less interested in the question of backdating than they are in a larger question-whether Aminex even legally held the coal mining rights that it passed on to the eight partnerships of investors.

When Livingston received one of the articles he read it only briefly. Livingston "dismissed" it because he did not read the *Philadelphia Inquirer.* Eliason could "hardly understand" the articles. However, the articles, together with the lack of economic return, caused him to believe that the investment "sure looked like a phony deal."

Livingston also received a copy of a letter from Kansas City attorney Larry Bold dated March 15, 1978, addressed to all partners of Polls Creek Associates of Kansas City. Attached to the letter was a March 13, 1978, article from the *Wall Street Journal* titled "Aminex Assets Placed Under Receiver as SEC Charges Ex–Officials." In his letter Bold stated that he had no way of knowing whether the receivership would help or hinder Polls Creek's lawsuit against Aminex, but "if the coal is in the ground and if we have good title, eventually we (or our children) will receive all of the financial benefits from this investment that we all anticipated." Bold also reported that the IRS was auditing Polls Creek with respect to the deductions "we all claimed on our 1976 tax returns."

It will be months before the Internal Revenue Service agent makes a determination as to whether or not he proposes to disallow the large deductions, and more than a year after that before the case can come to trial, assuming that the Internal Revenue Service does challenge the deductions.

Livingston does not recall reading either the letter or the newspaper article.

Levy, on behalf of Polls Creek Omaha, received Flomenhoft's "good news/bad news" letter dated May 26, 1978. (This letter was also received by the Double M–S partnership and the *Nerman* plaintiffs and is summarized at 671 F.Supp. at 658–59.) Levy sent Flomenhoft's letter to Magid and probably to the other partners. That letter caused Eliason to believe that the "good things" Rosenblum had told him about the tax aspects of Polls Creek looked "pretty bad." Nevertheless, Eliason continued to believe that with respect to the tax aspects of the investment, it was still a "sure deal."

Livingston learned about the SEC litigation against Aminex. He understood from "the filing that there may have been some fraud involved in the operations" on the part of Aminex.

Although Levy's active representation of Polls Creek Omaha ended in late 1977 or early 1978, he nevertheless continued to receive communications directed to the partnership. Levy forwarded these communications to one of the Polls Creek Omaha partners with instructions to pass them on to the other partners. Apparently, no one else was ever designated to receive communications on behalf of Polls Creek Omaha.

In May 1978, Albert prepared a financial statement, represented it to be correct and incorporated it in a property settlement agreement. Albert did not show his investment in Polls Creek Omaha as having any value. Had he thought it had any value, he would have included it in his financial statement.

Magid was upset about the Aminex bankruptcy in 1978. He realized that it could have an effect on his investment but believed that Polls Creek owned the coal.

In October 1979, Magid hired Levy to represent him in a personal injury matter. About that time, Levy recalled that Magid was unhappy with his Polls Creek Omaha investment; "he made me very aware of the fact that he lost his money."

In October 1979, Albert, Eliason and Livingston received requests for an extension of the period within which additional taxes could be assessed against them with respect to their 1976 tax returns.

Albert understood that the IRS was looking into Polls Creek. However, it never entered his mind that the deductions were improper because Rosenblum had told him it was a perfect investment when he invested. Also, Rosenblum told Albert not to worry about the IRS extension request: "I'll take care of it and everything will be fine."

Eliason sent his extension request to his personal accountant who had told him in 1979 that he did not have any confidence in

tax shelters. Eliason had not wanted to believe him then. Eliason understood that now the IRS was raising questions about the 1976 tax deductions. Eliason's personal accountant told him that the extension request meant that the IRS might assess additional taxes. Eliason chose to believe what Rosenblum had said several years before about the investment being "pretty much of a sure deal." Eliason thought there was a possibility his personal accountant was wrong.

Livingston discussed the extension request with Rosenblum who told him that the IRS was auditing all tax shelters. Rosenblum said that he thought there was a good case for allowing the deduction. Livingston relied on Rosenblum to tell him if there was a risk of disallowance.

In April 1981, Albert received an IRS examination report stating that the IRS had disallowed his 1976 deductions relating to Polls Creek. The report stated that Albert owed $21,179 or, under an alternative computation, $16,221 in additional taxes. Albert has no recollection of receiving the examination report. His standard procedure was to send documents from the IRS to Rosenblum. "I didn't pay any attention to them or read them."

The Polls Creek Omaha partners and Levy each received the letter from Flomenhoft dated May 22, 1981. (This letter was substantially similar to Flomenhoft's May 16, 1981, letter to the partners of Double M–S.) Included with Flomenhoft's letter was a copy of the Revenue Agent's Report disallowing all of Polls Creek's deductions. Albert did not recall receiving the letter. Eliason read the letter and understood that the Polls Creek IRS audit was complete. However, he did not think the IRS was "sincere." He thought it affected Polls Creek only and not him personally despite the reference to "each of you." Magid wondered if there were "real problems" when he got Flomenhoft's letter but he "was reassured that there was no problem really in the long run," presumably by Rosenblum. So Magid put the letter in his file "and let her go."

In March 1983, the IRS issued Notices of Deficiency to the partners of Polls Creek Omaha disallowing the deductions taken on their 1976 tax returns as a result of their investment in Polls Creek.

### c. Facts As to Claims of Plaintiff James Nesci

In December 1976, plaintiff James Nesci invested as a limited partner of Polls Creek Associates. Rosenblum had been Nesci's accountant since 1969. Rosenblum told Nesci that Grant's lawyers had checked out the investment and it was a good sound investment. Rosenblum assured Nesci that he would save $60,000 in taxes and get a 20–25 percent return on his $25,000 investment. Nesci relied on his accountant's judgment in making the investment.

In May 1978, Nesci received Flomenhoft's "good news/bad news" letter dated May 26, 1978. Nesci also received Flomenhoft's April 16, 1979, letter which had been sent to Simon of the Double M–S partnership. (These two letters are described above.) Nesci, however, "never did digest (any of Flomenhoft's letters) or understand them or read them thoroughly." He would "possibly" have been upset had he read the "good news/bad news" letter. He did not read this letter or others carefully and "digest or understand them" because he believed in Rosenblum and Grant.

In 1978, Nesci was not worried about the return on his investment or losing the $25,000 because Rosenblum had told him when he invested not to worry about losing the $25,000 because he would still have the benefit of the tax deduction.

After receiving Flomenhoft's April 16, 1979, letter, Nesci received a telephone call from Flomenhoft. During the conversation, Flomenhoft told Nesci that Polls Creek was "having trouble, that they were going to go file bankruptcy or somebody stole money or some darn thing like that...." Flomenhoft asked him to send money to "fight this thing." The conversation took place "some years" after the last time Nesci received any distributions from Polls Creek but at that point Nesci did not know or care whether he ever would get

any return on his investment because he would "still save on his tax." He also believed that he might still get a return because "they would straighten it out."

In October and November 1979, the IRS requested that Nesci consent to an extension of the period within which additional taxes could be assessed for 1976. Nesci knew that the IRS was investigating Polls Creek and needed more time to examine his tax return. Rosenblum told him to sign the extensions. Nesci was not concerned because he assumed Rosenblum would tell him if there was a problem.

In January 1981, Nesci received a letter from the United States Attorney for the Northern District of Illinois concerning an investigation into the sale of interests in Polls Creek.

The Office of the United States Attorney for the Northern District of Illinois is presently investigating possible criminal violations stemming from the sale of tax shelter interests in Polls Creek and Morgan Associates. It is our understanding that you were among the investors in one or both of these partnerships. We would appreciate your cooperation and request that you call either of us collect. We look forward to hearing from you.

This letter did not concern Nesci "because that was Polls Creek and that was where my $25,000 was, and if I lost that, I just wasn't concerned." He did not think it would affect his 1976 tax deduction because "they were investigating somebody in Illinois." At this point, he knew that he would probably lose his $25,000 but he was not concerned "because I already had my tax savings."

In March 1981, Nesci received an IRS examination report proposing to disallow the 1976 deductions relating to Polls Creek. Nesci's additional tax liability was computed at $60,964. Nesci realized that the IRS's position was inconsistent with what Rosenblum had told him. Nesci concluded at that time that if he had to pay more taxes for 1976, "I felt that he should pay it, because I based my investment on his bond and backing." ·

Nesci also received Flomenhoft's letter dated May 16, 1981. (This letter had also been received by the Double M–S partnership and is summarized above.) The enclosures with the letter, including the Revenue Agent's report, were in Nesci's file. He does not recall reading them.

In a letter dated February 5, 1982, to Rosenblum, Nesci said:

I received your letter regarding the increase in interest that Internal Revenue will charge in February of 1982. I appreciate your calling this to my attention; however, I feel that I do not owe the IRS any additional tax from the Polls Creek Partnership, let alone interest.

As you know, I acted upon your company's recommendation to invest into this partnership. As I listened to Alexander Grant's explanation of the partnership I had no idea that there would be potential tax consequences down the road.

From the memoranda from the IRS there exists the possibility of losing the investment of Polls Creek however I feel that if this does happen the interest and penalty should be borne by Alexander Grant. Therefore I do not wish to pay, nor do I have the ability to pay, the amount in question.

It has been some time since I have heard from Alexander Grant on this Polls Creek investment. I would appreciate it if I could be updated on its current position. Please write me about this as soon as possible.

In March 1983, Nesci received a Notice of Deficiency disallowing the deductions taken on his 1976 tax return with respect to his investment in Polls Creek. Prior to the seizure of his checking account by the IRS, Nesci had no reason to believe that he was not going to get his $25,000 back.

#### d.  Facts As to Claims of Plaintiff Robert Holmes .

Plaintiff Robert Holmes invested directly in Polls Creek. Holmes received a copy of the Investment Memorandum shortly after he invested. The risks described in the Investment Memorandum were inconsistent with what Holmes says Rosenblum told

him. He relied on what Rosenblum said about the investment being a good deal. He probably would not have invested had he known of the risks described in the Investment Memorandum.

After receiving letters from Flomenhoft referring to problems that had developed, Holmes hired a lawyer in late 1977 to represent him in connection with his investment. In late 1977, Holmes gave the lawyer all of the documents which he had relating to Polls Creek. He sent to his lawyers originals of documents he subsequently received.

Holmes received a copy of Flomenhoft's December 22, 1977, status report along with a copy of the securities fraud complaint filed by Polls Creek against Aminex. (These documents were also received by the Double M–S and Polls Creek Omaha partnerships and are described above.) Holmes quickly browsed through the documents before sending them to his lawyer. Holmes also received Flomenhoft's letter dated April 16, 1979, reporting the status of the Polls Creek fraud action against Aminex. (This is the same letter the Milders received in April 1979, and is described above.)

In late 1980, Holmes received an IRS examination report proposing disallowance of the Polls Creek tax deductions taken on his 1976 return. The report stated that he owed $54,364.55 or, under an alternative computation, $43,564.50 in additional taxes. Attached to the report was a copy of the Polls Creek audit report prepared by the IRS. Holmes was "not worried about this particularly" because Flomenhoft was saying that "we've got no problems, things are going okay" and Rosenblum had said nothing and "my attorney isn't worried about things."

In March 1981, Holmes received an examination report from the IRS "explaining the adjustments he made to your return because of your tax shelter activity." Holmes was not particularly concerned because Flomenhoft said everything was all right "and my attorney had got no great problems with the way things are going."

Holmes received a letter from Flomenhoft dated May 15, 1981. (This letter is substantially similar to the letters received by the Double M–S partnership, Nesci and the Polls Creek Omaha partnership and is described above.) Holmes also received with this letter the IRS Revenue Agent's Report on Polls Creek. Holmes was not concerned:

I don't think I had any special added concern. Everything I had seen and gotten from Howard Flomenhoft always ended up with, we are going to pull through this. Even though this went through bankruptcy or problems, we still got a chance of recovering all our economic value from it. I think I probably had hoped all the way through that, you know, one way or another we was going to come out of this whole.

On August 7, 1981, Flomenhoft sent a letter to Holmes which concluded with the following:

The whole matter is very unsettled now, though I can tell you, no matter what happens here, even if there is a substantial delay, it is my firm opinion that the Internal Revenue Service, considering the amount of revenue at stake and the fact that the Internal Revenue service is committed to taking all of these cases to court, will, in the end, still take the same position, that all deductions here are disallowed. Despite the fact that the result will not change, I would still be happy with a delay in this whole situation, to wait and see if other cases do go first and are decided, to enable us to make a more intelligent determination as to how we should proceed. In the meantime, I still expect the Internal Revenue Service in Omaha to proceed on your case, and issue the statutory Notice of Deficiency (the 90–day letter).

Holmes would have forwarded this letter to his attorney. Holmes was under the impression that the dispute with the IRS would drag on for years before a settlement was reached.

In March 1983, Holmes received a Notice of Deficiency from the IRS disallowing the deductions he had taken on his 1976 tax

return based on his investment in Polls Creek.

## Discussion

### The Fraud Counts

With the exception of the negligence count, the claims asserted in this case are based on allegedly false representations inducing investment. The representations involved both the soundness of underlying coal leases and contracts and the availability of tax sheltering deductions. Specifically, plaintiffs state that they were told that there was little, if any, risk that they would lose their investments because the coal leases were sound. Also, they say that Grant assured them that there was "no risk that the tax shelter deductions set up by defendants for plaintiffs would be disallowed by the Internal Revenue Service." Actual discovery of the alleged fraud would occur when plaintiffs discovered these representations were false.

█ By November 18, 1981, plaintiffs knew that these representations were false. Plaintiffs knew that they had lost their investments. They knew that they had not received a 20 percent return for any year from 1977 to 1981. Plaintiffs knew that they had lost their investment and that they had never received the promised return because the coal leases and contracts that Grant allegedly said were sound were unsound.

Furthermore, by November 18, 1981, plaintiffs knew that Grant's alleged representation that there was "no risk" that the tax deductions would be disallowed was false. In 1978, the IRS had begun an audit of the Polls Creek tax return. By May 1981, the 1976 deductions claimed by Polls Creek had been disallowed by the revenue agent. The threat to the deductions taken on the individual partners' returns was obvious and had been brought to the plaintiffs' attention both by Flomenhoft and by the IRS.

█ Plaintiffs cannot escape the conclusion that they had actual notice that the inducing representations were false by testifying that they had not read information sent to them or by blind reliance on Grant's silence or on Grant's assurances that there was no problem. In light of what plaintiffs knew and what they would have known had they read the material that was found in their files, unquestioning reliance on the assurances of defendants whose alleged representations were known to have been false is unreasonable.

█ Plaintiffs attempt to avoid the consequences of all they knew before November 18, 1981, by relying on § 516.100. They argue that the cause of action does not accrue until the last item of damage is capable of ascertainment "so that all resulting damage may be recovered and full and complete relief obtained." Although plaintiffs acknowledge that they had lost their investment by early 1981, they have argued ever since *Nerman* that there was more than one item of damage, i.e., the loss of the income tax deduction that they had been promised. Some plaintiffs state that they invested because of the tax benefits; others concede they invested for both the represented economic and tax benefits. Plaintiffs assert that the damage resulting from the loss of the tax deduction was not capable of ascertainment until plaintiffs received deficiency notices from the IRS in 1983.

All plaintiffs knew before November 18, 1981, that the representations that caused them to invest were false and that they had suffered damage as a result. Even those plaintiffs who say that they were not interested in the promised economic benefits knew that what they had been told about the economic benefits of the investment was false; they knew that their investment had been lost. They had been damaged.

Section § 516.100 does not require that the last item of damage must be sustained, or even that the full extent of the damage be known before the damage was "capable of ascertainment." In *Brower v. Davidson, Deckert, Schutter & Glassman*, 686 S.W.2d 1 (Mo.App.1984), the plaintiffs argued that the statute of limitations on their negligence claim against their lawyers and accountants did not begin to run until an agreement was reached with the IRS about

how much in additional tax was owed. Only then, they contend, was their damage "capable of ascertainment." In rejecting this argument the court quoted with approval from *Dixon v. Shafton,* 649 S.W.2d 435, 439 (Mo. banc 1983):

'In many actions the extent of damage may be dependent on uncertain future events. A personal injury plaintiff might be awaiting an operation which might substantially effect the extent of liability. If a lawyer overlooks the statute of limitations in filing his suit, there may be no certainty that the suit, if filed, would be successful or of the amount which might be recovered. Such uncertainties have never been held to preclude the filing of suit and, under the authorities cited above, have not delayed the accrual of the plaintiff's claim for purposes of the statute of limitations. *The most that is required is that some damages have been sustained, so that the claimants know that they have a claim for some amount.* These requirements were met in the case at bar.'

*Id.* at 3–4 (emphasis supplied).

Emphasizing that the statute of limitations begins to run when the "fact of damage" is discoverable, not when its full extent is known, the court concluded that "the fact of damage was 'capable of ascertainment'" at least by the date when the IRS agent issued his report calculating the amount of deficiency.

From that point on, plaintiffs can scarcely claim that they did not know that they were exposed to a substantial tax liability by reason of the failure to complete the distribution of the corporate assets before January 26, 1973. They knew also, if it was the case, that accountant Milligan's omission to perform his duty, or the attorneys' omission to perform their duty, was to blame for the failure to accomplish the distribution within the allowable time. The "discoverability" of the fact of damage (See *Follmer's Market, Inc. v. Comprehensive Accounting Service Company,* 608 S.W.2d 457, 460 (Mo.App.1980); *Thorne v. Johnson,* 483 S.W.2d 658 (Mo.App.1972)), could no

longer be an open question. It was not only "discoverable"; it was discovered. *Brower,* 686 S.W.2d at 3. The date that the fact of damage was discoverable was not delayed by plaintiffs contesting the deficiencies for over four years after the date of the agent's report. *Id.*

In *Zero Manufacturing Co. v. Husch,* 743 S.W.2d 439 (Mo.App.1987), where the court stated:

[Plaintiff] erroneously argues that the five year statute of limitations contained in RSMO § 516.120(4) did not begin to run until all the damages were capable of ascertainment; that is, [plaintiff] asserts the cause of action did not accrue until June 1981, when [plaintiff] received the last bill for legal services regarding the Svanoe matter. *The statute of limitations begins to run once the fact of damage is capable of ascertainment, even though amount of damage is not yet ascertainable. Brower, v. Davidson, Deckert, Schutter & Glassman, P.C.,* 686 S.W.2d 1, 4 (Mo.App., W.D. 1984). See also *Dixon v. Shafton,* 649 S.W.2d 435 (Mo. banc 1983).

*Id.* at 441 (emphasis supplied).

Here, the fact of damage from Grant's representations was discovered before November 18, 1981. As in *Brower,* plaintiffs can scarcely claim that they did not know before November 18, 1981, that they were exposed to a substantial and ascertainable tax liability by reason of Grant's false representations about the economic integrity of Polls Creek and about the "no risk" tax deductions. *See Brower,* 686 S.W.2d at 3. Furthermore, each partner had suffered damage by the loss of promised income and the loss of the amount invested. Therefore, even though some plaintiffs maintained a relationship with Grant, all plaintiffs knew everything they needed to know to assert a fraud claim against Grant before November 18, 1981.

Plaintiffs' reliance on *Linn Reorganized School Dist. No. 2 of Osage County v. Butler Manufacturing Co.,* 672 S.W.2d 340 (Mo. banc 1984), is misplaced. There, the court distinguished *Dixon* because in *Dixon,* the damages were capable of ascer-

tainment from a certain date while in *Linn* they were not. In the instant case, the amount of damage that plaintiffs would suffer if the deductions were disallowed was capable of ascertainment in 1981. What was not known was whether plaintiffs would be successful in persuading the IRS to change its mind about the propriety of the deductions. As *Dixon* teaches, such uncertainty is not enough to delay the accrual of a claim for purposes of the statute of limitations.

■ Plaintiffs argue that defendant should be estopped from asserting the statute of limitations. A party may be estopped from asserting the statute of limitations if the party has prevented the plaintiff from commencing a cause of action or induced plaintiff to refrain from filing suit before it is barred by the statute of limitations. *Cacioppo v. Southwestern Bell Tel. Co.*, 550 S.W.2d 919, 926 (Mo.App.1977). The elements of estoppel are:

> (1) an admission, statement or act inconsistent with a claim afterwards asserted and sued upon; (2) action by the other party on the faith of such admission, statement or act; and, (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement or act.

*Sisters of St. Mary v. Dennigmann*, 730 S.W.2d 589, 593 (Mo.App.1987).

The second element of an estoppel claim can be satisfied only if the party asserting the estoppel reasonably relied on statements made or acts committed by the other party which were inconsistent with the claim the other party later asserted.

> * * * [O]ne relying on an estoppel must have exercised such reasonable diligence to acquire knowledge of the real facts as the circumstances of the case require. If he conducts himself with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss he cannot invoke the doctrine of estoppel.

*Peerless Supply Co. v. Industrial Plumbing & Heating Co.*, 460 S.W.2d 651, 667 (Mo.1970).

Thus, in this case, plaintiffs can satisfy the second element of their estoppel claim only if they reasonably relied on statements made or acts committed by defendants which were inconsistent with the statute of limitations defense that defendants now assert.

■ Basically, plaintiffs rely on the same facts to satisfy the first element of their estoppel theory that they raised in making their fraudulent concealment argument. Plaintiffs argue that defendants led them to believe that they would receive the promised return on their investment and the promised tax deductions thereby inducing plaintiffs to refrain from filing their suit either before November 18, 1981, or at any time between November 17, 1981, and the date on which they filed suit. However, even if one assumes that defendants committed acts or made statements inconsistent with defendants' later assertion of the statute of limitations, plaintiffs have failed to provide facts supporting the conclusion that they were induced to refrain from filing suit earlier in reasonable reliance on defendants' actions or statements.

Plaintiffs knew that the representations that induced them into investing in Polls Creek were false long before November 18, 1981. Based on what plaintiffs knew about defendants' track record, the representations and acts upon which plaintiffs rely for their estoppel claim were highly suspicious. As a matter of law, defendants did not induce plaintiffs to refrain from filing their cause of action before November 18, 1981, or at any time between November 17, 1981, and the date suit was filed, by any act or statement upon which plaintiffs could have reasonably relied. Therefore, plaintiffs' attempt to estop defendants from asserting the statute of limitations defense fails.

For the reasons stated in this opinion, and for the reasons stated by defendants in their many briefs in this case and in *Nerman* supporting the conclusion that plaintiffs had actual knowledge of the alleged fraud before November 18, 1981, defendants' motion for summary judgment on Counts III, IV, VI, VII and VIII will be granted.

*The Negligence Count*

For the reasons stated in granting defendants' motion for summary judgment on the fraud counts, plaintiffs knew or should have known about the alleged breach of defendants' duty and the damage from the breach was capable of ascertainment before November 18, 1981. Accordingly, defendants' motion for summary judgment on Count V will be granted.

*Defendants' Request for Sanctions Under Rule 11*

For the reasons stated by plaintiffs in their opposition to the motion for sanctions under Rule 11 (Doc. 58), defendants' request for sanctions under Rule 11 will be denied.

*Order*

Therefore, it is hereby ORDERED that:

1) defendants' motion for summary judgment is granted and this case is dismissed with prejudice at plaintiffs' costs; and

2) defendants' motion for sanctions is denied.

